## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **PAMELA SAECHOW,** | |
| **PLAINTIFF,** | **CIVIL ACTION NO. _____** |
| **v.** | |
| **PHILADELPHIA ACADEMIC HEALTH SYSTEM, LLC,** | **JURY TRIAL DEMANDED** |
| **AMERICAN ACADEMIC HEALTH SYSTEM, LLC,** | |
| **PALADIN HEALTHCARE CAPITAL, LLC,** | |
| **and** | |
| **JOEL FREEDMAN,** | |
| **DEFENDANTS.** | |

## COMPLAINT AND JURY DEMAND

Plaintiff Pamela Saechow, by and through her attorneys, Bell & Bell, LLP, hereby

files the following Complaint and Jury Demand ("Complaint").

## PRELIMINARY STATEMENT

1.  This is an action for an award of damages, liquidated damages, and other relief on

behalf of Plaintiff Pamela Saechow ("Ms. Saechow"), a former employee of

Philadelphia Academic Health System, LLC ("PAHS"), American Academic

Health System, LLC ("AAHS") and Paladin Healthcare Capital, LLC ("Paladin")

(hereinafter, PAHS, AAHS and Paladin are collectively referred to as "the

Company"). Ms. Saechow was supervised in her position, in part, by Joel

Freedman, the Owner, Chairman and Chief Executive Officer of PAHS and

AAHS and a former owner, Chairman and Chief Executive Officer of Paladin. Ms. Saechow has been harmed by the Company's breach of contract, failure to pay wages including severance, bonus pay and tuition reimbursement in violation of the Pennsylvania Wage Payment and Collection Law, wrongful termination of Ms. Saechow's employment, fraudulent inducement, retaliation for whistleblowing in violation of the Pennsylvania Whistleblower Law, and by Defendants' defamation of Plaintiff.  Plaintiff also raises claims of promissory estoppel/detrimental reliance, unjust enrichment, and seeks a declaration that the non-compete agreement with the Company is invalid and unenforceable.  This action arises under the Pennsylvania Wage Payment and Collection Law, 43 Pa. C. S. § 260.1, et seq. ("WPCL") the Pennsylvania Whistleblower Law, 43 Pa. C. S. § 1421, et seq. ("PWL") and Pennsylvania common law.

## JURISDICTIONAL STATEMENT

2. This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

3. The amount in controversy in this matter exceeds the jurisdictional minimum exclusive of interest and costs.

4. The Parties hereto are citizens and/or residents of different states.

5. Plaintiff Pamela Saechow is a citizen and resident of New Jersey.

6. Defendant Philadelphia Academic Health System, LLC is a Delaware corporation with its corporate headquarters and principal place of business in Pennsylvania.

7. Defendant American Academic Health System, LLC is a Delaware corporation with its corporate headquarters and principal place of business in California.

8.   Defendant Paladin Healthcare Capital, LLC is, upon information and belief, a
     Delaware corporation with its corporate headquarters and principal place of
     business in California.

9.   Defendant Joel Freedman is, upon information and belief, a citizen and resident of
     Pennsylvania.

10.  This Court has jurisdiction over any Pennsylvania state law claims pursuant to 28
     U.S.C. § 1367.

## **VENUE**

11.  This action properly lies in the Eastern District of Pennsylvania, pursuant to 28
     U.S.C. § 1391(b) because the claims arose in this judicial district.

12.  This action properly lies in the Eastern District of Pennsylvania because
     significant activities associated with the claims alleged took place in this
     jurisdiction, Plaintiff performed her work for Defendants in this jurisdiction, and
     the non-compete agreement at issue in this matter specifically indicates that venue
     in this jurisdiction is proper.

## **PARTIES**

13.  Plaintiff Pamela Saechow ("Ms. Saechow" or "Plaintiff") is an adult, female
     individual resident and citizen of Jersey City, New Jersey and the United States of
     America.

14.  Defendant Philadelphia Academic Health System, LLC (hereinafter "PAHS") is a
     Delaware corporation with its corporate headquarters and principal place of
     business in Pennsylvania.  PAHS has a corporate address at 230 N. Broad Street,

5th Floor Administration, Philadelphia, PA 19102.  Upon information and belief, none of PAHS' members are citizens of New Jersey.

15. Defendant American Academic Health System, LLC (hereinafter "AAHS") is a Delaware corporation with its corporate headquarters and principal place of business in California.  AAHS has a corporate address at 222 N. Sepulveda Blvd., Suite 900, El Segundo, CA 90245.  Upon information and belief, none of AAHS' members are citizens of New Jersey.

16. Defendant Paladin Healthcare Capital, LLC (hereinafter "Paladin") is a Delaware corporation with its corporate headquarters and principal place of business in California.  Paladin has a corporate address at 222 N. Sepulveda Blvd., Suite 900, El Segundo, CA 90245.  Upon information and belief, none of Paladin's members are citizens of New Jersey.

17. Defendant Joel Freedman is the owner, Chairman and Chief Executive Officer of both AAHS and PAHS and a former owner, Chairman and Chief Executive Officer of Paladin.

18. Defendants PAHS, AAHS and Paladin each were and are business entities that do significant business within the Commonwealth of Pennsylvania, are engaged in an industry affecting commerce, acted as Ms. Saechow's employers and/or contracted with Ms. Saechow.

19. At all relevant times, employees of Defendants acted as agents and servants for Defendants.

20. At all relevant times, employees of Defendants were acting within the scope of their authority and in the course of employment under the direct control of Defendants.

21. At all times material hereto, Defendants acted by and through their authorized agents, servants, workmen and/or employees acting within the course and scope of their employment with Defendants and in furtherance of Defendants' business.

22. This cause of action arose out of transactions or occurrences that took place in whole or in part in Philadelphia, Pennsylvania.  Further, Defendants conduct substantial business within Philadelphia, Pennsylvania.

23. This Honorable Court has personal jurisdiction over the Defendants.

24. Defendants own and/or manage multiple hospitals in Philadelphia, Pennsylvania including Hahnemann University Hospital and St. Christopher's Hospital for Children.

25. Defendants AAHS, PAHS and Paladin, at all relevant times, had common ownership, management and are interchangeable business entities.

26. Defendant AAHS, PAHS and Paladin were, at all relevant times, operated as one single business entity.  For example, among other things, despite her Employment Agreement being with PAHS, Ms. Saechow was paid by AAHS and all other Agreements were between Ms. Saechow and AAHS.

27. AAHS, PAHS and Paladin used their corporate identities interchangeably with respect to contract formation and shared mailing addresses and corporate offices.

28. AAHS, PAHS and Paladin shared resources, including employees, during Ms. Saechow's employment.

29. During her employment, Ms. Saechow performed significant work for and/or on behalf of PAHS, AAHS and Paladin.

**FACTS**

30. Ms. Saechow is a well-respected, highly skilled and accomplished Information Technology executive with extensive experience in her field.

31. Prior to beginning her employment with the Company, Ms. Saechow was employed as an Associate Chief Information Officer at a nationally renowned healthcare organization that is consistently among the top-grossing hospitals in the United States and highly regarded in the area of technological management systems.

32. On or about August 6, 2016, Ms. Saechow was introduced to the owners of PAHS and AAHS, Joel and Stella Freedman, at the wedding of a mutual friend. Mrs. Freedman and the bride (hereinafter referred to as the "Mutual Friend") were close friends and Mrs. Freedman was in the wedding party.

33. Over the course of the next few months, Ms. Saechow occasionally saw the Freedmans socially during events that were also attended by the Mutual Friend.

34. In or around November or December of 2016, Mr. Freedman approached Ms. Saechow regarding a potential Chief Information Officer ("CIO") position with respect to some upcoming acquisitions by the Company.

35. Thereafter, Ms. Saechow had a phone interview and provided salary expectations. Mr. Freedman indicated he would be back in touch after the Company had a solid acquisition date. Mr. Freedman asked Ms. Saechow if she could review the transition contract for him "as a friend" which Ms. Saechow agreed and did.

36.  On or about August 26, 2017, at a birthday celebration for their Mutual Friend in
     Florida, Mrs. Freedman began to aggressively pursue Ms. Saechow to work as
     CIO for the Company.  Ms. Saechow declined the initial offer because of her then
     current position of Associate Chief Information Officer with a nationally
     renowned organization.

37.  Mrs. Freedman asked the Mutual Friend on a number of occasions to help the
     Company with recruiting Ms. Saechow, saying to the Mutual Friend, "tell Pam
     [Saechow] to come work for us."

38.  On or about September 29, 2017, at a dinner attended by Mr. and Mrs. Freedman,
     the Mutual Friend, her husband, and Ms. Saechow, Mr. Freedman again
     approached Ms. Saechow to attempt to recruit her to join the Company asking
     her, "are you done having fun [in your current position] and ready to join me?  I
     could use your talent."

39.  On January 26, 2018, at a charity event attended by Mr. and Mrs. Freedman, the
     Mutual Friend and her husband, and Ms. Saechow, Mrs. Freedman again
     attempted to convince Ms. Saechow to leave her position and join the Company.

40.  On or about April 13-15, 2018, during a baby shower for another mutual friend
     that was being co-hosted by Mrs. Freedman and the Mutual Friend that she had
     been in the wedding party for, Ms. Saechow stayed as a guest at Mrs. Freedman's
     house.

41.  During this baby shower, Mrs. Freedman continued to aggressively recruit Ms.
     Saechow for a CIO position with the Company.

42. On or about June 26, 2018, Mr. Freedman, along with his Chief Administrative Officer ("CAO"), contacted Ms. Saechow and offered her a position as CIO.

43. Ms. Saechow conveyed that in her next position she was expecting her total annual compensation to be commensurate with her expectations as she was leaving a world-class organization.

44. Mr. Freedman indicated that he and Mrs. Freedman would be thrilled for Ms. Saechow to serve as CIO for the Company given her excellent work ethic, reputation for results in the industry and her reputation for having a talent pool that followed her from one organization to the next.

45. To ensure that Ms. Saechow would earn a total compensation package that was commensurate with her salary expectations, the Company offered a significant bonus.

46.  Ms. Saechow indicated she needed some time to consider the offer and Mr. Freedman responded that he was anxious to bring her on board and not to take too long deciding.

47. Ms. Saechow contacted Mr. Freedman in or around July of 2018, and requested to meet with the Company's executive team to understand their financial performance and business model to assure it was a good fit before leaving her position with her current organization, given that the Company was a start-up healthcare organization.

48. After meeting with the executive team in July, Ms. Saechow met with Mr. Freedman one-on-one to discuss his goals for the Information Technology ("IT") department and budget expectations.

49. During this meeting, Mr. Freedman indicated his understanding that Ms. Saechow was a making a significant sacrifice and leap of faith in leaving a world-class organization, but assured Ms. Saechow that he believed that one day PAHS would "outshine" her current organization.

50. Mr. Freedman also indicated that he wanted to have the IT system go live in October of 2019, but would understand a delay of a few months in order to ensure proper function.

51. Ms. Saechow questioned Mr. Freedman about his IT budget, which he initially indicated he thought might be approximately $6,000,000, but that he would defer to Ms. Saechow's expertise in this regard.

52. Ms. Saechow cited the industry benchmark for IT from gartner, for both steady state and what it would need to spend when changing out all of its systems to build a new foundation/department, that the Company should expect to spend given her industry knowledge.

53. Mr. Freedman indicated that operating revenue was an estimated $800,000,000, but that IT was so critical to the Company's needs that he would find the money in the budget and make the right investments into IT.

54. Ms. Saechow inquired about Mr. Freedman's leadership style and he assured her that he is a hands-off leader and he would trust Ms. Saechow to perform her job with support from Mr. Rajkamur.

55. Mr. Freedman also promised that Ms. Saechow would be one of 4-5 individuals who would be given an equity share of the Company.

56. On or about July 8, 2018, Mrs. Freedman visited the Mutual Friend in Florida and asked her to attempt to persuade Ms. Saechow to take the job offer with the Company.

57. During the week of July 16, 2018, Ms. Saechow contacted Mr. Freedman to verbally accept the offer.

58. On July 20, 2018, Ms. Saechow was offered the position of Chief Information Officer with the Company pursuant to a written employment agreement – "the Offer Letter".

59. Pursuant to the Offer Letter, Ms. Saechow would be reporting to the CEO (Mr. Freedman) and CAO, with a start date of August 13, 2018.

60. In the Offer Letter, the Company promised Ms. Saechow an substantial annual salary (paid bi-weekly) along with benefits, participation in the Company's 401(k) Plan, paid time off, and reimbursement of housing and tuition costs.

61. The Company also promised Ms. Saechow an significant monetary implementation bonus of upon the new IT system going live (the "IT go-live project") with benchmarks to be established within the first 90 days of Ms. Saechow's employment.  Thereafter, Ms. Saechow was promised an annual bonus of 30% of her base salary, with benchmarks to be established within the first 90 days of her employment.

62. The Company also promised Ms. Saechow severance pay in the event that she was terminated for any reason other than for cause on the following schedule: six months of severance pay if she were to be terminated during the first year of

employment, and one year of severance pay if she were to be terminated any time after her first year.

63. In reliance upon the promises contained in the Offer Letter, and the other promises made to her by Mr. Freedman, Ms. Saechow resigned from her stable position with a world-class organization, sold her house, relocated and began working for the Company.

64. On August 6, 2018, Ms. Saechow attended a welcome dinner with Mr. and Mrs. Freedman and the Company's CAO in Philadelphia.  During this dinner, Ms. Saechow disclosed to Mr. and Mrs. Freedman and the CAO her intention to use staffing companies to assist with the task of staffing the IT department and engaging qualified consultants to assist with and ensure the success of the go-live project.

65. Mrs. Freedman responded that the Company trusted Ms. Saechow's decisions with respect to staffing and bringing in talent to help the Company's IT department succeed and indicated "you have full authority to make decisions within IT."

66. Ms. Saechow was completely transparent in her efforts to staff the IT department, including her plans to hire consultants, and in disclosing the expected costs of various budget items for IT that included staffing and use of consultants.

67. A formal staffing plan that disclosed staffing firms and rates, along with a draft IT budget was presented to Mr. Freedman and the CAO on or about August 22, 2018 and officially signed off on by Mr. Freedman on September 5, 2018 to begin on-boarding staff as a critical path activity to support the go-live date.

68. On October 2, 2018, Ms. Saechow attended an event along with Mrs. Freedman, their Mutual Friend, and later, Mr. Freedman.  During the dinner, Mr. Freedman brought up the possibility of the Mutual Friend and her husband partnering with the Company.  The Mutual Friend reminded Mr. Freedman that the Company was already doing business with her.  Mr. Freedman indicated that he was thrilled that the Company and the Mutual Friend were working together and hugged and kissed the Mutual Friend.  Repeatedly, prior to this event, Mr. Freedman expressed his desire to work with the Mutual Friend and her husband.

69. On or about October 3, 2018, Mrs. Freedman and the Mutual Friend had a personal falling out, and the next day, October 4, 2018, Mr. Freedman confided to Ms. Saechow that Mrs. Freedman felt very upset, hurt and betrayed that the Mutual Friend would attempt to make money off of their close friendship.  Mr. Freedman stated, inaccurately, that he had no idea that the firm he had been doing business with was owned, in part, by the Mutual Friend.  Ms. Saechow reminded Mr. Freedman that she had disclosed information regarding all consulting firms along with adhering to the process for vendor procurement, and had been told that the Freedmans trusted her judgment with respect to staffing and IT.  Ms. Saechow also suggested that any miscommunication or personal falling out should be handled between Mrs. Freedman and the Mutual Friend.  Mr. Freedman stated that he was "disappointed" in Ms. Saechow's judgment, but that her role in the Company would overcome the disappointment.  Mr. Freedman ended the discussion by saying that he would like to cancel the contract with the Mutual Friend's company, but not at the risk of the IT go-live project.

70. The next day, October 5, 2018, Ms. Saechow received a message from Mr.
Freedman that he and Mrs. Freedman had decided to terminate the agreement
with the Mutual Friend's company (the "firm"). He directed Ms. Saechow to work
out a way to convert several of the firm's consultants ("the direct referrals") to be
direct consultants with the Company and not through the firm, and to pass on all
other consultants from the firm and seek resources elsewhere.  Mr. Freedman
indicated that if this impaired the IT go-live project, he would be open to retaining
these consultants in some manner.  Ms. Saechow responded that she would work
on this request with Assistant General Counsel and Chief Human Resources
Officer ("CHRO") John DiNome and Chief Legal Counsel Svetlana Attestatova.
Mr. Freedman responded, "Thx Pam – we will make this work."  As of October
10, 2018, the IT go-live project was on track for the target go-live date as a result
of Ms. Saechow's efforts.  Mr. Freedman did not indicate to Ms. Saechow that he
believed she had engaged in any wrongdoing, that her job was in jeopardy, or that
the contract with the firm could somehow constitute "cause" to fire Ms. Saechow.

71. Shortly thereafter, Ms. Saechow and Mr. DiNome began meeting with the firm to
attempt to assess the option of making firm hires direct with the Company.
Ultimately, it was decided that the risk outweighed the benefits as the Company
had determined that it should not hire firm consultants directly because it might
compromise their position in potential litigation with the firm.

72. When Ms. Saechow discussed this with Mr. Freedman, he indicated that he
wanted to renegotiate the terms of the contract he had approved with the firm.
Mr. Freedman indicated that he wanted the firm to agree to disclose its contracts

with individual consultants, despite no contractual obligation upon the firm to do so, and that instead of paying the agreed upon contract price, he would pay a markup on the contract cost rather than adhering to the contract terms that he had previously agreed to with the firm.

73. Ms. Saechow met with Mrs. Freedman on October 16, 2018 and Mrs. Freedman disclosed that she would "never trust [the Mutual Friend] again". Ms. Saechow noted that the dispute was between Mrs. Freedman and the Mutual Friend personally and reminded Mrs. Freedman that she had discussed the firm with her on August 6th, but that Mrs. Freedman had indicated the Company trusted Ms. Saechow to do what was best for the Company. Ms. Saechow assured Mrs. Freedman that she had done what was best for the Company and this would be the same course she would have taken with any other organization, bringing in trusted talent. Mrs. Freedman did not indicate to Ms. Saechow that she believed Ms. Saechow had engaged in any wrongdoing, that her job was in jeopardy, or that the contract with the firm could somehow constitute "cause" to fire Ms. Saechow. Indeed, Mrs. Freedman told Ms. Saechow, "if you follow us and help us, you will be rich with us."

74. In late October of 2018, Mr. Freedman complained to Ms. Saechow about various executives in the organization and indicated that he could not trust any of them other than Ms. Saechow and Ms. Attestatova.

75. Over the course of the following months, as the Company's financial picture grew more problematic, Mr. Freedman made statements and engaged in conduct displaying that he was becoming increasingly desperate to find a way out of the

contract with the firm in order to save money.[1]  Likewise, as the Company's financial pressure mounted, including pressure by the firm to make payment of money due pursuant to the contract with the firm, Mr. Freedman became increasingly hostile toward Ms. Saechow.

76. On or about October 15, 2018, Ms. Saechow learned that newly arrived Chief Clinical Transformation Officer Dr. Manny Sacapano would also be overseeing the IT department.  Almost immediately upon taking oversight responsibility for the IT department, Dr. Sacapano was openly hostile and demeaning toward Ms. Saechow, including during meetings in front of other staff.

77. On one occasion in late October of 2018, Dr. Sacapano inappropriately propositioned Ms. Saechow.

78. Ms. Saechow was convinced that Dr. Sacapano's treatment of her was directly related to her sex.[2]

79. Ms. Saechow believed that she was being pressured to engage in illegal and unethical activities.

80. Around this same time, in or around October or November of 2018, Ms. Saechow began to become extremely concerned about cost-saving measures that were being implemented that she believed compromised patient safety.

---

[1] This was typical of Mr. Freedman's behavior while Ms. Saechow was employed by the Company.  Mr. Freedman engaged in a pattern of attempting to renegotiate contracts after the fact.

[2] Ms. Saechow is also filing a Charge of Discrimination with the United States Equal Employment Opportunity Commission to be dual-filed as a Complaint of Discrimination with the Pennsylvania Human Relations Commission with respect to race and sex discrimination and harassment, and retaliation for complaining about discrimination and harassment.  Ms. Saechow will seek leave to amend this Complaint once she has exhausted her administrative remedies with respect to these claims.

81. For example, Ms. Saechow was concerned that the Company was using equipment that was at or near the end of its service life, which was putting patient safety at risk. Ms. Saechow raised these concerns on several occasions, but was discouraged from doing so.

82. Ms. Saechow specifically raised concerns regarding endoscopy machines which were not operating properly and sometimes not operating at all.  These equipment failures led to procedures being cancelled and patients being transferred, and Ms. Saechow feared that this would result in diagnosis and treatment delays for patients.  In addition, in the process of transferring patients because of these equipment problems, Company personnel would download patient data to thumb drives to give to the new physicians receiving the patients, in violation of applicable privacy and other regulations.

83. Management emphasized cost-cutting and discouraged Ms. Saechow's complaints.

84. Ms. Saechow complained on several occasions, beginning in October of 2018 and continuing through the end of her employment, to Mr. DiNome, Ms. Attestatova, and others that she was being discriminated against and harassed, and about the unethical and illegal activity she observed regarding patient safety and other issues.

85. In December of 2018, Ms. Saechow was also subjected to sex discrimination by Dr. Troy Sybert.  Ms. Saechow observed that Dr. Sybert treated female employees less favorably than male employees, and this observation was supported by

numerous other female employees who confided in Ms. Saechow that they also felt this way about Dr. Sybert.

86. Others in the company indicated agreement with Ms. Saechow's use of consulting resources and Ms. Saechow's decision to retain talent that she had previous experience with.

87. In early November of 2018, despite previously assuring Ms. Saechow at the outset of her employment that IT was so critical to the Company's needs that he would find the money in the budget and make the right investments into IT, Mr. Freedman began to complain extensively about IT costing too much.

88. On November 19, 2018, Mr. Freedman met with Ms. Saechow and Ms. Saechow reminded Mr. Freedman that his actions and treatment of her regarding IT decisions, among other issues, had made it increasingly difficult to perform the job she had been hired to do.  Mr. Freedman threatened to sue Ms. Saechow if she were to leave to work elsewhere with only thirty days notice or before completing the IT go-live project, then asked her to "keep her nose to the grind and keep working hard" because he believed in her talent.  Ms. Saechow then presented Mr. Freedman with a number of potential solutions to reduce the IT budget and still meet a 2019 go-live date.  At the conclusion of the meeting, Mr. Freedman asked Ms. Saechow for a hug and kissed her on the forehead.

89. In early December of 2018, Mr. Freedman set a meeting with Cerner Corporation, one of the top vendors that provides technology solutions to healthcare companies, and requested that Ms. Saechow work with Cerner to defer payments in order to assist with cashflow.

90. The Company engaged in a concerted effort to undermine Ms. Saechow and took other actions that challenged her ability to effectively perform her job.  At or around the same time of the Cerner meeting, the Company engaged a senior IT consultant, Sreekant Gotti, to provide advice regarding the IT department.  Mr. Freedman and others openly questioned Ms. Saechow's authority by leaving Ms. Saechow out of important decisions, and broadcasting to vendors and colleagues in various ways that Ms. Saechow's influence was limited.

91. During the week of December 31, 2018, the firm's attorney sent a letter to the Company seeking to collect payment for past due amounts.

92. Shortly thereafter, on January 7, 2019, Mr. Freedman discussed the firm's demand for payment with Ms. Saechow.

93. On January 8, 2019, Mr. Freedman threatened that, with respect to his argument with the firm over their contract, Ms. Saechow would, "need to interject and agree or things will get really ugly and you will get pulled into it personally."

94. Mr. Freedman continued to put pressure on Ms. Saechow and continued to unreasonably seek to renegotiate the contract with the firm.

95. Later on January 8, 2019, Ms. Saechow lodged another complaint with Mr. DiNome.

96. Despite Mr. Freedman's treatment of her, Ms. Saechow continued to try to best serve the Company by attempting to follow through with requests made by Mr. Freedman.

97. On January 9, 2019, Ms. Saechow was informed that she would now be reporting to Dr. Sybert, a demotion, which was particularly problematic in light of Dr. Sybert's treatment of women.

98. During a meeting between Dr. Sybert, Cerner, other executives, and one of Ms. Saechow's subordinates, on January 10, 2019, Ms. Saechow was not included in or invited to discuss critical decision making as the CIO – further support for the idea that Ms. Saechow's role had been marginalized.

99. On January 10, 2019, the firm responded that all communications from the Company should be directed to the firm's counsel.

100. Later on January 10, 2019, for the very first time, Mr. Freedman accused Ms. Saechow of having engaged in wrongdoing.

101. Around this same time, Mr. Freedman began to make false statements about Ms. Saechow to other employees.

102. On January 13, 2019, after being subjected to a toxic environment by the Company since her hire, and after having been asked to engage in unethical and illegal conduct on countless occasions, Ms. Saechow complained in writing to John DiNome, Joel Freedman, and others.

103. Specifically, Ms. Saechow complained that she had "been working in a toxic environment and have been treated unfairly in many situations. The environment for which I work in is hostile, I feel threatened, and have been diminished. As we discussed, I feel targeted as a woman. As the only female Asian executive here, I have felt targeted, and at times have felt frightened and intimidated. In addition, I am very concerned that I am being asked to do things that are potentially

unethical and illegal.  I have tried to do the right thing by resisting being pushed into doing these things, but I feel as if in response I have been punished.  For example, I have essentially been demoted with my recent reporting relationship modified.  I have also been excluded from critical discussions regarding the strategy and direction of IT.  I've been defamed in my role that impacts me here and in the industry.  It is just disrespectful and I need help in finding a way to fix this situation.  My health has been compromised.  I also would like to follow-up on the topic of being subjected to inappropriate conduct by Dr. Manny Sacapano."

104. The following day, Mr. DiNome met with Ms. Saechow to discuss her complaint and also indicated he wanted to discuss the issue with the firm.

105. At the conclusion of this meeting, in direct and immediate retaliation for her written and earlier complaints, Ms. Saechow was informed that she was being placed on paid suspension while the Company investigated her concerns.

106. Despite the clear indication that Ms. Saechow was being punished for complaining, Mr. DiNome assured Ms. Saechow several times that her suspension was not a negative action or punitive because she was being placed on suspension with pay.

107. While she was suspended, Ms. Saechow learned that the Company continued to defame her.  For example, Ms. Saechow learned that the Company had defamed her to one of its third-party vendors including indicating that Ms. Saechow had been terminated for cause.

108. Almost immediately after placing her on suspension, the Company engaged in additional, overt retaliation against Ms. Saechow.  For example, the Company

openly removed Ms. Saechow's email and other IT access, indicating to everyone that Ms. Saechow worked with, Company employees and other industry contacts outside of the Company, that Ms. Saechow had engaged in wrongdoing.

109. This immediate removal of Ms. Saechow's IT privileges also made clear that the Company had already reached a conclusion with respect to Ms. Saechow's complaints and her fate with the Company.

110. The Company made clear that it had not, in fact, placed Ms. Saechow on suspension to investigate her most recent complaints.

111. Instead, while it was supposedly investigating her complaints about being asked to engage in illegal activity and discrimination, the Company was actually attempting to fabricate a reason to terminate Ms. Saechow for cause in order to retaliate against Ms. Saechow and to avoid paying her severance or any portion of the bonus she had been promised.

112. On January 25, 2019, Ms. Saechow received a termination letter indicating that she was terminated for cause effective immediately.  Each of the reasons offered for Ms. Saechow's termination are complete fabrications and not supported by the evidence.

113. With respect to the other reasons offered for Ms. Saechow's termination, Ms. Saechow did not engage in any of the conduct referenced in the termination letter, evidenced by the fact that, among other things, she was never once disciplined, counseled or reprimanded for mismanagement, failure to take direction from the owner, disrespecting her peers, or disparaging other executives.

114. To the extent that the Company listed Ms. Saechow disrespecting her peers and disparaging other executives in her termination letter as a criticism of Ms. Saechow's raising her concerns about discrimination and harassment, this constitutes further retaliation.

115. In connection with her hiring, Ms. Saechow was required to sign an agreement titled "Restrictive Covenants Agreement" (the "Non-Compete Agreement").

116. The Non-Compete Agreement contains a clause that purports to restrict Ms. Saechow from competing with the Company for a period of one year after her termination, regardless of the reason for separation, within fifty miles of the facility for which Ms. Saechow last performed work or within fifty miles of any Company facility at which she had performed work in the past two years.

117. The Non-Compete Agreement contains a clause that reserves to the Company the right to seek injunctive relief with respect to the Non-Compete agreement "from any court…"

118. Ms. Saechow's reputation and ability to earn a living in her field have been irreparably compromised.

119. By convincing Ms. Saechow to accept employment with the Company, and to leave her previous, lucrative employment based upon representations that the Company knew were false at the time they made them to Ms. Saechow, the Company fraudulently induced Ms. Saechow to leave her prior employment and accept employment with the Company.

120. By luring her away from lucrative employment based upon representations the Company knew to be false at the time, the Company tortiously interfered with Ms. Saechow's contractual relationships.

121. By terminating Ms. Saechow in retaliation for her refusal to go along with, and objection to the illegal and unethical activity being condoned and engaged in by the Company, the Company wrongfully terminated Ms. Saechow in violation of Pennsylvania public policy.

122. By terminating Ms. Saechow in retaliation for her reporting waste and/or wrongdoing, the Company violated the Pennsylvania Whistleblower Law.

123. By making false, negative statements regarding Ms. Saechow to third parties, including co-workers and vendors, Defendants have defamed Ms. Saechow.

124. By defaming Ms. Saechow to industry contacts, the Company tortiously interfered with Ms. Saechow's prospective contractual relationships as she seeks a new position in the healthcare industry.

125. By failing to provide Ms. Saechow with the position, bonus and severance pay promised, the Company breached its contract with Ms. Saechow.

126. By failing to provide Ms. Saechow with six months of severance, the Company breached its contract with Ms. Saechow.

127. By failing to provide Ms. Saechow with the bonus it had promised, the Company breached its contract with Ms. Saechow.

128. In terminating Ms. Saechow on January 25, 2019, the Company breached its implied or verbal contract with Ms. Saechow.

129. In failing to provide Ms. Saechow with an equity interest, the Company breached its implied or verbal contract with Ms. Saechow.

130. In accepting the benefits of Ms. Saechow bringing her knowledge and expertise to bear to make progress on the IT go-live project, and then terminating Ms. Saechow in retaliation for, among other reasons, her objecting to and refusing to participate in illegal activity, the Company has been unjustly enriched.

131. In failing to pay Ms. Saechow earned wages, including bonus, severance and tuition reimbursement, Defendants violated the WPCL.

132. Ms. Saechow has suffered lost wages and other benefits of employment because of Defendants' wrongful acts, as alleged herein.

133. Ms. Saechow has suffered emotional loss because of Defendants' wrongful acts, as alleged herein.

134. Following her termination, Ms. Saechow suffered severe emotional and psychological distress as a result of the Company's defamation, and other post-termination efforts to prevent her from securing gainful employment.

135. Ms. Saechow is entitled to a declaration by This Honorable Court that the Non-Compete Agreement is invalid and unenforceable against Ms. Saechow.

### COUNT I
### Breach of Contract
### (Plaintiff v. PAHS, AAHS and Paladin)

136. Plaintiff repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

137. The Company entered into a contract with Ms. Saechow wherein it agreed to pay Ms. Saechow severance pay in the event that Ms. Saechow was terminated without cause.

138. The Company entered into a contract with Ms. Saechow wherein it agreed to pay Ms. Saechow a significant monetary bonus for the IT go-live project.

139. The Company breached its contract with Ms. Saechow as alleged herein.

140. Ms. Saechow seeks damages for the Company's breaches of the aforementioned contract.

141. The Company's conduct is without excuse or justification.

## COUNT II
### Breach of Implied Contract of Employment
### (Plaintiff v. PAHS, AAHS and Paladin)

142. Plaintiff repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

143. The Company breached an implied agreement with Plaintiff when it prematurely terminated her employment before the parties expected term of the implied agreement, and before Ms. Saechow was able to complete the IT go-live project in 2019.

144. As set forth above, Ms. Saechow has alleged facts from which it can be determined that there was an implied contract between the Company and Ms. Saechow based upon additional consideration, under which she could not be terminated until at least 2019, without just cause and/or for a reasonable time.

145. The Company's termination of Ms. Saechow after only approximately five months without just cause, and prior to the completion of the IT go-live project,

was a breach of the implied contract.

146. Plaintiff seeks damages for breach of the verbal or implied agreement including damages for money Plaintiff would have been entitled to but for the Company's breach.

## COUNT III
### Pennsylvania Wage Payment and Collection Law
### (Plaintiff v. All Defendants)

147. Plaintiff repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

148. Defendants violated the Pennsylvania Wage Payment and Collection Law ("WPCL") when they failed to pay Ms. Saechow her wages within the time specified by law.

149. At all relevant times, Defendants were employers within the meaning of 43 Pa. C. S. 260.2(a) of the WPCL.

150. At all relevant times, Defendant Joel Freedman was a person and employer within the meaning of 43 Pa. C. S. 260.2(a) of the WPCL, and an active decision-maker with respect to Ms. Saechow's unpaid wages.

151. At all relevant times, Defendants PAHS, AAHS and Paladin were employers within the meaning of 43 Pa. C. S. 260.2(a) of the WPCL with respect to Ms. Saechow's unpaid wages.

152. The wages earned by Ms. Saechow, but not paid by Defendants include Ms. Saechow's severance pay of 6 months of severance.

153. The wages earned by Ms. Saechow, but not paid by Defendants include bonus pay and unpaid tuition reimbursement.

154. Defendants willfully failed to pay Plaintiff wages earned as defined by the WPCL during the course of her employment within the time limits prescribed by the WPCL.

155. Following the termination of Plaintiff's employment, Defendants willfully failed to pay her wages earned within the time limits prescribed by the WPCL.

156. Defendants have failed to pay wages due for a period in excess of thirty (30) days beyond regularly scheduled paydays.

157. As the direct and proximate result of Defendants' violation of the Pennsylvania Wage Payment and Collection Law, Plaintiff has sustained a loss of earnings, liquidated damages, and interest due thereon and has incurred attorneys' fees and costs.

**<u>COUNT IV</u>**
**Fraudulent Inducement**
**(Plaintiff v. All Defendants)**

158. Plaintiff repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

159. The Company fraudulently misrepresented to Plaintiff its intentions regarding her position by fraudulently misrepresenting to Plaintiff the terms and conditions of her employment.

160. At the time the Company made the above representations, it did not intend to abide by the representations it had made.

161. The misrepresentations made by Defendants were fraudulent.

162. The misrepresentations made by Defendants were of material facts.

163. Plaintiff relied on the false and/or misleading statements, conduct and representations of the Defendants and sustained the losses and damages as previously set forth herein.

164. The misrepresentations by Defendants induced Plaintiff to leave a lucrative position and relocate.

165. Defendants intended that Plaintiff would rely upon the misrepresentations.

## COUNT V
### Promissory Estoppel/Detrimental Reliance
### (Plaintiff v. All Defendants)

166. Plaintiff repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

167. Defendants promised Plaintiff that she would become an equity shareholder of the Company as set forth herein.

168. Defendants further promised Plaintiff that she would receive a significant bonus upon completion of the IT go-live project.

169. Defendants further promised Plaintiff that she would receive six months of severance in the event she was terminated without cause during the first year of her employment.

170. Plaintiff reasonably relied upon these promises to her detriment by relocating, giving up a lucrative position and by working tirelessly, from before her official start date to meet the expected go-live date of the IT go-live project.

171. Defendants did not honor these promises, as they terminated Ms. Saechow, did not pay any portion of the bonus promised, concocted a fraudulent "for cause" reason for Ms. Saechow's termination to avoid paying her the agreed upon

severance amount, and have not provided the ownership interest that was promised.

172. For the reasons set forth above, Defendants are liable to Plaintiff under a theory of Promissory Estoppel or Detrimental Reliance.

**COUNT VI**
**Unjust Enrichment**
**(Plaintiff v. PAHS, AAHS and Paladin)**

173. Plaintiff repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

174. Plaintiff conferred benefits upon the Company in the form of giving up a lucrative position, by working tirelessly from before her official start date to meet the expected go-live date of the IT go-live project, and by making significant progress on the IT go-live project.

175. The Company appreciated the benefits conferred by Plaintiff.

176. The Company accepted the benefits of Plaintiff's giving up a lucrative position and working tirelessly, from before her official start date to meet the expected go-live date of the IT go-live project.

177. The Company accepted the benefits conferred on them by Plaintiff under circumstances that would make it inequitable for the Company to retain such benefits without payment of value to Ms. Saechow.

178. For the reasons set forth above, Defendants are liable to Plaintiff under a theory of Unjust Enrichment.

<u>COUNT VII</u>
**Tortious Interference With Contractual Relations**
**(Plaintiff v. All Defendants)**

179. Plaintiff repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

180. By luring Ms. Saechow away from her previous employment based upon false representations regarding her anticipated position at the Company, Defendants tortiously interfered with Plaintiff's contractual relationships with third parties.

181. By defaming Ms. Saechow to third parties, including others within Ms. Saechow's industry, Defendants have tortiously interfered with Plaintiff's prospective contractual relationships with third parties.

182. Defendants have wrongfully, willfully, intentionally and maliciously interfered with Plaintiff's contractual relationships.

183. Defendants took these acts for their own financial gain, with the knowledge and intent to harm Plaintiff financially, professionally and personally.

184. Defendants acted in a willful, intentional and malicious manner and with reckless indifference to Plaintiff's contractual relationships.

185. By tortiously interfering with Plaintiff's contractual relations, Defendants caused and will continue to cause Plaintiff economic and emotional harm.

186. As a consequence of Defendants' tortious conduct, Plaintiff has sustained and continues to sustain economic losses, damages to her income, her career, her reputation and her income potential.

187. As a further consequence of Defendants' tortious conduct, Plaintiff has been forced to expend substantial sums of money to protect her interests and is entitled to reimbursement for these expenses as a part of her damages.

## COUNT VIII
**Wrongful Termination**
**(Plaintiff v. PAHS, AAHS and Paladin)**

188. Plaintiff repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

189. The Company terminated Ms. Saechow as a result of Ms. Saechow's opposition to and refusal to engage in unethical and illegal activity as alleged herein.

190. The Company terminated Ms. Saechow in violation of Pennsylvania public policy for her refusal to engage in unethical and illegal activity.

191. The above described conduct of the Company constituted wrongful termination of Plaintiff.

192. Defendants' actions were willful and malicious, and warrant the imposition of punitive damages.

193. As a result of her wrongful termination, Ms. Saechow has suffered lost wages, including lost salary, lost benefits, loss of income potential.

194. As a result of her wrongful termination, Ms. Saechow has suffered severe emotional and psychological distress.

## COUNT IX
**Pennsylvania Whistleblower Law**
**(Plaintiff v. PAHS, AAHS and Paladin)**

195. Plaintiff repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

196. Ms. Saechow made good-faith reports to her employer, by complaining to Human Resources and the Legal Department, that the Company was engaging in waste or wrongdoing.

197. In retaliation for her complaints, the Company terminated Ms. Saechow in violation of the PWL on January 25, 2019.

198. Ms. Saechow has suffered financial losses as a direct and proximate result of the actions and inactions of the Company.

199. As a result of the Company's conduct described herein, Ms. Saechow has incurred a significant obligation for attorneys' fees and costs of bringing this action.

200. As a result of the Company's conduct described herein, Ms. Saechow has suffered and continues to suffer significant emotional distress.

201. The Company and its agents acted with knowledge of, or in reckless disregard of the probability that their actions and inactions would cause Ms. Saechow to suffer emotional distress.

## COUNT X
### Defamation
### (Plaintiff v. All Defendants)

202. Plaintiff repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

203. As stated above, Defendants, through Mr. Freedman and others, made untrue statements and misrepresentations about Plaintiff to third parties, including industry contacts such as vendors and former co-workers.

204. At the time of their publication, the false statements made by Defendants harmed the reputation of Plaintiff in the estimation of the community by creating a false

impression, among other things, of Plaintiff's being unfit to conduct her business, trade or profession, and of Plaintiff having committed a crime.

205. Third parties hearing Defendants' statements understood that the statements published by Defendants related to the Plaintiff.

206. Defendants promulgated the untrue statements with knowledge, among other things, that Plaintiff was not unfit to conduct her business, trade or profession, and that Plaintiff had not committed a crime.

207. Defendants promulgated the untrue statements with reckless disregard for their truth or falsity.

208. Defendants' promulgation of the untrue statements exposed Plaintiff to contempt, ridicule, hatred and degradation of character.

**<u>COUNT XI</u>**
**Declaratory Judgment**
**(Plaintiff v. PAHS, AAHS and Paladin)**

209. Plaintiff repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

210. The Non-Compete Agreement contains language that purports to restrict Ms. Saechow from competing within fifty miles of her last position.

211. Because the Company terminated Ms. Saechow, thus indicating that she was of no further value and of no further threat to compete, the Company has no legitimate interest in attempting to prevent Ms. Saechow from competing.

212. The restrictive covenants contained in the Non-Compete Agreement are overly broad as to time and geographic scope with respect to Ms. Saechow.

213. Because Plaintiff was employed at the Company a mere five months before her wrongful termination, there was no consideration for the non-compete provisions of the Non-Compete Agreement.

214. The non-compete provisions of the Non-Compete Agreement do not protect the Company's legitimate business interest and are instead aimed at stifling competition.

215. The non-competition provisions of the Non-Compete Agreement impose an undue hardship upon Plaintiff because they deprive Plaintiff of her livelihood in an industry in which she has spent many years developing contacts, a reputation, and relationships.

216. The unreasonable, overbroad and unduly burdensome non-compete provisions of the Non-Compete Agreement injure the public interest because, among other things, they unreasonably restrain competition and deprive the public of Plaintiff's expertise.

217. Plaintiff is suffering and will continue to suffer lost income and other damages in the event the Company attempts to enforce the invalid non-compete provision of Ms. Saechow's Agreement.

218. The Company has indicated, in its termination letter to Plaintiff, that she is under a continuing obligation to inform prospective employers of her Non-Compete Agreement.

219. Said harm to Plaintiff is irreparable and ongoing.

220. Plaintiff's harm in the Company continuing to insist upon enforcement of the invalid non-compete provision cannot be compensated by money alone.

221. The Company and/or its agents know or should know in the reasonable exercise of business judgment that the Non-Compete Agreement they are attempting to enforce is invalid and unenforceable against Ms. Saechow.

222. The Company and/or its agents know or should know in the reasonable exercise of business judgment that a non-compete provision is unenforceable against a former employee who was terminated for reasons other than for cause.

223. The Company and/or its agents know or should know in the reasonable exercise of business judgment that a non-compete provision is unenforceable against a former employee where it is overly broad as to time and geographic scope.

224. Plaintiff seeks a declaratory judgment to determine her rights and obligations under the Agreement.

225. Plaintiff seeks a declaratory judgment that the non-compete provisions contained in the Non-Compete Agreement are invalid and/or unenforceable against her.

## **PRAYER FOR RELIEF**

226. Plaintiff repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

**WHEREFORE**, Plaintiff Pamela Saechow respectfully requests that this Court enter judgment in her favor and against Defendants and enter an Order:

(a)    Ordering appropriate equitable relief;

(b)    Ordering Defendants to compensate Plaintiff with a rate of pay and other benefits and emoluments of employment to which she would have been entitled had she not been wrongfully terminated;

(c)     Ordering Defendants to compensate Plaintiff for the emotional distress suffered as a result of Defendants' unlawful actions;

(d)     Ordering Defendants to pay Plaintiff's unpaid wages;

(e)     Ordering Defendants to pay Plaintiff the damages she suffered as a result of Defendants' breach of contract;

(f)     Ordering Defendants to provide the equity in the Company promised to her;

(g)     Ordering Defendants to pay Plaintiff liquidated or punitive damages;

(h)     Ordering Defendants to pay Plaintiff's attorneys' fees and costs of suit;

(i)     Declaring that the non-compete provision is invalid and unenforceable;

(j)     Such other and further relief as is deemed just and proper.

## JURY DEMAND

Plaintiff Pamela Saechow hereby demands trial by jury as to all issues so triable.

Jennifer C. Bell, Esquire
PA Attorney I.D. No.  81045
Christopher A. Macey, Jr., Esquire
PA Attorney I.D. No. 207800
Bell & Bell LLP
1617 JFK Blvd. – Suite 1254
Philadelphia, PA 19103
(215) 569-2500

Attorneys for Plaintiff
Pamela Saechow

DATE: May 13, 2019