IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| PAMELA SAECHOW,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>PHILADELPHIA ACADEMIC HEALTH<br>SYSTEM, LLC, et al.,<br><br>　　　　　　Defendants. | CIVIL ACTION<br>NO. 19-2075 |

## OPINION

**Slomsky, J.**                                                                                    **March 31, 2021**

## I.    INTRODUCTION

Before the Court is the Second Motion to Compel Arbitration and Stay Proceedings filed

by Defendants American Academic Health System, LLC, Paladin Healthcare Capital, LLC, and

Joel Freedman ("Defendants").   (Doc. No. 23.)[1]   Defendants move to stay this case pending

arbitration, arguing Plaintiff is subject to a binding and valid arbitration provision.   (See id. at 1.)

Plaintiff opposes the Motion, asserting that Defendants cannot compel arbitration of her claims

---

[1]    On July 16, 2019, another defendant, Philadelphia Academic Health System, LLC ("PAHS"),
and the three Defendants noted above filed a Motion to Compel Arbitration and Stay
Proceedings (Doc. No. 8) and also a Notice of Bankruptcy Stay as to PAHS (Doc. No. 10).   On
September 11, 2019, the three Defendants filed a Motion to Stay Proceedings (Doc. No. 13)
pending resolution of the bankruptcy litigation, and the Court entered an Order scheduling a
hearing on the Motion to Stay for October 4, 2019 (Doc. No. 15).   Prior to the hearing, the
parties jointly filed a Stipulation to Stay Proceedings for Sixty (60) Days (Doc. No. 17) because
Plaintiff anticipated receiving her Notice of Right to Sue Letter from the Equal Employment
Opportunity Commission ("EEOC") within the sixty days, at which point she would seek leave
to amend her Complaint (Doc. No. 1).   Following the hearing, the Court granted the sixty-day
stay and also entered an Order granting Plaintiff leave to file an amended complaint.   (Doc.
Nos. 19-21.)   After receiving her Letter Notice from the EEOC, Plaintiff filed the Amended
Complaint (Doc. No. 22) on February 28, 2020, and on March 13, 2020, the three Defendants
filed the Second Motion to Compel Arbitration and Stay Proceedings (Doc. No. 23), which is
presently before the Court for disposition.

because they are non-signatories to the agreement to arbitrate.   (See Doc. No. 24-2 at 14.)
Alternatively, she argues the arbitration provision at issue is unconscionable and therefore
unenforceable and that her claims in Counts VII and X of the Amended Complaint, discussed infra,
are outside the scope of its coverage.   (See id. at 2, 13.)   Defendants' Motion is now ripe for
disposition.

For reasons that follow, the Court will grant Defendants' Second Motion to Compel
Arbitration and Stay Proceedings.

## II.   BACKGROUND[2]

This suit arises out of Plaintiff's employment with, and termination from her position as,
Chief Information Officer ("CIO") at Defendants Philadelphia Academic Health System, LLC
("PAHS"),[3] American Academic Health System, LLC ("AAHS"), and Paladin Healthcare Capital,
LLC ("Paladin") (collectively "the Company").   (See Doc. No. 22 ¶ 1.)   Joel Freedman
("Defendant Freedman" or "Freedman") is "the Owner, Chairman and Chief Executive Officer of
PAHS and AAHS and a former owner, Chairman and Chief Executive Officer of Paladin."   (Id.)[4]
Defendants "own and/or manage multiple hospitals in Philadelphia."   (Id. ¶ 19.)

Plaintiff is a "well-respected, highly skilled and accomplished Information Technology
executive with extensive experience in her field."   (Id. ¶ 25.)   Prior to her employment with the

---

[2]   For purposes of this Opinion, the Court accepts as true all factual allegations in the Amended
Complaint (Doc. No. 22) and documents relied upon therein.   See infra Section III.

[3]   Defendant PAHS filed a petition for bankruptcy in the United States Bankruptcy Court for the
District of Delaware, and on July 16, 2019, PAHS filed a Notice of Bankruptcy Stay in this
case.   (See Doc. No. 10.)   Accordingly, all claims against PAHS are stayed until the conclusion
of the bankruptcy proceedings.   (See Doc. Nos. 23-2 at 6 n.1; 24-2 at 2 n.1.)

[4]   In Plaintiff's Response to the Motion, she avers that PAHS is "a subsidiary of AAHS, which
is in turn a subsidiary of Paladin and all three of which are owned by Mr. Freedman."   (Doc.
No. 24-2 at 10.)

Company, she was an "Associate [CIO] at a nationally renowned healthcare organization that is consistently among the top-grossing hospitals in the United States and highly regarded in the area of technological management systems." (Id. ¶ 26.)

### A.   Plaintiff's Employment and Termination

In November or December 2016, Freedman approached Plaintiff for the first time regarding a potential CIO position with the Company. (See Doc. No. 22 ¶ 29.) Thereafter, Plaintiff had a phone interview with Freedman during which she "provided salary expectations." (Id. ¶ 30.) On August 26, 2017, Freedman and his wife[5] ("the Freedmans") began to "aggressively pursue" Plaintiff for the CIO position. (Id. ¶ 31; see also id. ¶¶ 32-36.) The Freedmans' recruitment efforts persisted over seven months. (See ids.)

On June 26, 2018, Freedman verbally offered Plaintiff the CIO position to which she responded that "she was expecting her total annual compensation [as CIO of the Company] to be commensurate with her expectations as she was leaving a world-class organization." (Id. ¶ 38; see also id. ¶ 37.) Given Plaintiff's "excellent work ethic" and reputation in the industry for achieving results and "having a talent pool that followed her from one organization to the next," the Company offered her a "significant bonus" to ensure that she "would earn a total compensation package commensurate with her salary expectations." (Id. ¶¶ 39-40.)

After taking "some time to consider the offer," Plaintiff asked Freedman to meet with the Company's executive team in July 2018 to better "understand their financial performance and business model." (Id. ¶¶ 41-42.) "[G]iven that the Company was a start-up healthcare

---

[5]   The Amended Complaint states that on August 6, 2016, Plaintiff "was introduced to the owners of PAHS and AAHS, Joel and Stella Freedman, at the wedding of a mutual friend" and over the next few months, Plaintiff occasionally saw the Freedmans at social events. (Doc. No. 22 ¶¶ 27-28.)

organization," Plaintiff wanted to meet with the executive team in order to ensure that the Company would be a good fit for her before she decided to leave her current position with a "world-class organization." (Id. ¶¶ 42, 44.)

After meeting with the executive team, Plaintiff met with Freedman "one-on-one to discuss his goals . . . and budget expectations" for the Information Technology ("IT") department. (Id. ¶ 43.) They also discussed Plaintiff's role in meeting these goals as the new CIO of the Company. (See id. ¶¶ 44-49.) Specifically, Plaintiff would be tasked with building and implementing a new IT "foundation/department" to replace the Company's current systems ("the 'IT go-live project'"). (Id. ¶ 47; see also id. ¶ 56.)

While discussing details about the IT go-live project, Plaintiff "questioned . . . Freedman about his IT budget, which he initially indicated he thought might be approximately $6,000,000, but that he would defer to [Plaintiff's] expertise in this regard." (Id. ¶ 46.) Based on her industry knowledge, Plaintiff provided Freedman with an estimate of what "the Company should expect to spend" in "changing out all of its systems to build a new foundation/department." (Id. ¶ 47.) Freedman responded that the Company's "operating revenue was an estimated $800,000,000, but [because] IT was so critical to [its] needs[,] he would find the money in the budget and make the right investments into IT." (Id. ¶ 48.)

During the week of July 16, 2018, Plaintiff verbally accepted Freedman's offer for the CIO position with the Company. (See id. ¶ 52.) Four days later, Plaintiff "was offered the [CIO] position . . . pursuant to a written employment agreement – 'the Offer Letter'." (Id. ¶ 53; see also Doc. No. 24-2 at 4.) Attached to the Offer Letter were copies of the: (1) "Open Door Policy and Fair Treatment Process" ("the FTP Policy")[6]; (2) "Open Door Policy and Fair Treatment Process

---

[6]   (See Doc. No. 23-2, Ex. 1 ¶ 7 & Ex. B.)

Acknowledgement Form" ("the Acknowledgment Form")[7]; and (3) "Restrictive Covenants

Agreement" ("the RCA") (see Doc. No. 24-3).[8]

The Offer Letter, dated July 20, 2018, contains the signatures of Defendant Freedman and

Plaintiff, as well as a list of the three enclosures described supra.  (See Doc. No 23-2, Ex. 1 ¶ 6 &

Ex. A.)[9]  The Offer Letter provides, in relevant part:

> On behalf of [PAHS], an affiliate of [AAHS], it is my pleasure to offer you the
> position of [CIO]. . . . ***By accepting this offer, as a condition of employment, you
> agree to be bound by the [FTP Policy], including its mandatory arbitration
> provision***, a copy of which is enclosed with this letter.  This offer is contingent
> upon: (1) your successful completion of identity verification, employment
> authorization and pre-employment background check and drug screening; (2) your

---

[7]   (See id., Ex. 1 ¶ 8 & Ex. C.)

[8]   The Offer Letter, FTP Policy, and Acknowledgment Form were attached as exhibits to
Defendants' Motion.  (See Doc. No. 23-2, Ex. 1 ¶¶ 6-8 & Exs. A, B, & C.)  The RCA was
attached as an exhibit to Plaintiff's Response to the Motion.  (See Doc. No. 24-3.)  In reviewing
a motion to compel arbitration, the Court may consider the complaint and its supporting
documents, including "the substance of the contracts that ostensibly compel arbitration."
CardioNet, Inc. v. Cigna Health Corp., 751 F.3d 165, 168 n.2 (3d Cir. 2014); Guidotti v. Legal
Helpers Debt Resolution, L.L.C., 716 F.3d 764, 776 (3d Cir. 2013); see also Johnson v. Ergon
West Virginia, Inc., No. 14-453, 2015 WL 5286234, at *2 (W.D. Pa. Sept. 10, 2015)
("Although not attached to the Second Amended Complaint . . . the Contract is a document
relied upon in said Complaint—submitted by Defendant as an exhibit to the Motion to [Compel
Arbitration]—and thus it will be considered by the Court."); Shank v. Fiserv, Inc., No. 15-
5319, 2016 WL 161902, at *2 n.1 (E.D. Pa. Jan. 14, 2016) (stating that for Guidotti purposes,
the "complaint" includes the motion to compel arbitration and the documents attached thereto).

As discussed below, because the Amended Complaint relies upon the contract at issue here,
i.e., the Offer Letter and its enclosures, see infra Section IV, and because these documents are
attached as exhibits to the parties' briefs with respect to the instant Motion, the Court may
properly consider the substance of these documents.

[9]   In her Response to the Motion, Plaintiff states that: "[i]n order to begin working for PAHS,
[she] was required to execute . . . [the RCA] and the [Acknowledgment Form] acknowledging
receipt and agreement to PAHS' [FTP Policy]. . . . The FTP [Policy] was not necessary or
relied upon in drafting . . . [the Amended Complaint].  Although not appended to Defendants'
Motion, the [RCA] was also attached to and referenced in [Plaintiff's] Offer Letter."  (Doc.
No. 24-2 at 4 & n.4.)  Thus, it is undisputed that Plaintiff received, along with her Offer Letter,
a copy of the FTP Policy, Acknowledgment Form, and RCA.  The parties do not dispute the
authenticity of these documents.

agreement to be bound by PAHS's practices and policies; and (3) execution of the [RCA] and [Acknowledgment Form] that are enclosed with this letter. . . . This [O]ffer [L]etter, along with its enclosures, contains the entire agreement between [Plaintiff] and PAHS.

(See id.)

The Offer Letter also includes a start date of August 13, 2018, as well as the following terms and conditions of Plaintiff's employment: she would be reporting to Freedman and PAHS's Chief Administrative Officer; a description of her compensation package, which would include a "substantial" bi-weekly annual salary "along with benefits, participation in the Company's 401(k) Plan, paid time off, . . . reimbursement of housing and tuition costs," and bonuses she would become eligible to receive at PAHS's discretion, including a "significant monetary implementation bonus . . . upon the new IT system going live" and thereafter, "an annual bonus of 30% of her base salary."  (Doc. No. 22 ¶¶ 54-56; see also Doc. No. 23-2, Ex. 1 ¶ 6 & Ex. A.)

The FTP Policy enclosed with the Offer Letter provides, in relevant part:

> [AAHS], its consolidated subsidiaries, parents, affiliates, hospitals, healthcare operations and other entities owned or operated by [AAHS]'s consolidated subsidiaries (collectively, "AAHS" or the "Company") utilize an Open-Door Policy designed to encourage employees to openly express . . . any issue related to their employment. . . . [I]n addition to the Open-Door Policy, AAHS has established the Fair Treatment Process . . ., a comprehensive mechanism for resolving employment-related disputes between the Company and its employees. . . . that ultimately provides for ***final and binding arbitration*** of such disputes . . . .

(Doc. No. 23-2, Ex. 1 ¶ 7 & Ex. B at 1, 3) (emphasis added).  The FTP Policy contains a mandatory arbitration provision ("the FTP Arbitration Provision"), which states, in relevant part:

> ***The FTP applies to all employees, regardless of length of service or status, and covers all disputes relating to or arising out of an employee's employment with the Company or the termination of employment.***  The only disputes or claims not covered by the FTP are those listed in the "Exclusions and Restrictions" section below.  ***Examples of the type of disputes or claims covered by the FTP include, but are not limited to, claims for wrongful termination of employment, breach of contract, employment discrimination,*** harassment or retaliation under the Americans With Disabilities Act, the Age Discrimination in Employment Act, ***Title***

> *VII* of the Civil Rights Act of 1964 and its amendments or any state or local discrimination laws, *tort claims or any other legal claims and causes of action recognized by local, state or federal law* or regulations. *An employee's decision to accept employment or to continue employment constitutes his or her agreement to be bound by the FTP. Likewise, the Company agrees to be bound by the FTP. This mutual agreement to arbitrate claims means that both the employee and the Company are bound* to use the FTP process as the only means of resolving employment-related disputes, *and thereby agree to forego any right they each may have had to a jury trial on issues covered by the FTP.*
>
> . . .
>
> The arbitration process is limited to disputes, claims or controversies that a court of law would be authorized or have jurisdiction over to grant relief and that in any way arise out of, relate to or are associated with an employee's employment with the Company or the termination of employment.

(Id.) (emphasis added).[10]

Also enclosed with the Offer Letter was the Acknowledgment Form, which provides, in relevant part:

> Welcome to *[PAHS] . . ., an affiliate of [AAHS]*. . . . You acknowledge that you have . . . received a copy of the [FTP Policy] . . . from PAHS. [The FTP Policy] is a mutual dispute resolution and arbitration program, which sets forth PAHS's procedure for resolving workplace disputes ending in final and binding individual arbitration. You understand that it is your responsibility to read and familiarize yourself with the information contained in the FTP [Policy]. You understand that, by accepting or continuing your employment with PAHS, you are agreeing to be bound by the FTP [Policy].

(Id., Ex. 1 ¶ 8 & Ex. C) (emphasis added).

As previously stated, see supra note 9, Plaintiff avers in her Response to the Motion to Compel that, prior to her employment with the Company, she was "required to execute . . . the [Acknowledgment Form] acknowledging receipt and agreement to . . . [the FTP Policy]." (Doc. No. 24-2 at 4.) Plaintiff was also "required to sign a non-compete agreement," i.e., the RCA.

---

[10] The FTP Arbitration Provision contained in the FTP Policy constitutes the arbitration agreement at issue.

(Doc. No. 22 ¶ 110.)   The RCA "contains restrictions against [Plaintiff] disclosing PAHS'[s] confidential information, soliciting or interfering with PAHS'[s] relationship with its employees or others engaged by PAHS, and competing with PAHS during her employment and for one year thereafter." (Doc. No. 24-2 at 4; see also Doc. No. 24-3 ¶¶ 2-4.)[11]  It also "reserves to the Company the right to seek injunctive relief with respect to the [RCA] 'from any court . . .'" (Doc. No. 22 ¶ 112; see also Doc No. 24-2 at 4.)  The relevant language from the RCA provides that:

> [Plaintiff] agrees and acknowledges that the injury the [Company] would suffer because of breach of the Non-Disclosure, Non-Solicitation or Non-Competition in [sic] provisions would be irreparable and that an award of monetary damages for breach would be an inadequate remedy.  Consequently, *the [Company] shall have the right . . . to obtain injunctive relief from any court or arbitrable tribunal of competent jurisdiction to restrain any breach or threatened breach or to specifically enforce any provision of the [RCA]* . . .

(Doc. No. 24-3 ¶ 5) (emphasis added).

On July 20, 2018, Plaintiff countersigned the Offer Letter (see Doc. No. 23-2, Ex. 1 ¶ 6) and executed the Acknowledgment Form in which she "acknowledged receiving a copy of the [FTP Policy] and agreed to be bound by it." (Id., Ex. 1 ¶ 8; see also Doc. No. 24-2 at 4.)  Thereafter, "[i]n reliance upon the promises contained in the Offer Letter, and the other promises made to her by . . . Freedman, [Plaintiff] resigned from her stable position with a world-class organization, sold her house, relocated and began working for the Company." (Doc. No. 22 ¶ 58.)

Shortly after Plaintiff was hired, her relationship with Defendants began to breakdown. During the month of August 2018, Plaintiff began engaging staffing companies and consulting firms "to assist with and ensure the success of" the IT go-live project. (Id. ¶ 59.)  To this end, she

---

[11]   Plaintiff claims the RCA contains non-disclosure, non-solicitation, and non-competition provisions with respect to PAHS only. (See Doc. No. 24-2 at 4.)  However, the RCA explicitly provides that it is entered "by and between [AAHS], including its parents, subsidiaries, affiliates, divisions, successors, and related entities . . . and [Plaintiff]." (Doc. No. 24-3 at 2.)

presented Freedman and the Chief Administrative Officer with a formal staffing plan and IT budget detailing the expected costs of these resources, which they approved on September 5, 2018. (Id. ¶¶ 61-62.)  One of the approved consulting firms ("the Firm") was owned by a mutual friend of the Freedmans and Plaintiff ("Mutual Friend").  (See id. ¶¶ 63-64.)  After a personal falling out between Mrs. Freedman and the Mutual Friend, Defendant Freedman informed Plaintiff that he decided to terminate the contract with the Firm.  (See id. ¶¶ 64-65.)

Over the next few months, "the Company's financial picture grew more problematic" and the Firm began pressuring the Company "to make payment of money due pursuant to [its] contract." (Id. ¶ 70.)  At this point, Freedman appeared to be "desperate[ly] [trying] to find a way out of the contract with the [F]irm in order to save money" and "became increasingly hostile toward [Plaintiff]." (Id.)  Between late October 2018 and early January 2019, Freedman continued to pressure Plaintiff about the contract dispute with the Firm and on one occasion threatened that she "would 'need to interject and agree or things will get really ugly and [Plaintiff] will get pulled into it personally." (Id. ¶ 88; see also id. ¶¶ 86-89.)

On October 15, 2018, Plaintiff learned that the Company hired Chief Clinical Transformation Officer Dr. Manny Sacapano to oversee the IT Department.  (See id. ¶ 71.) "Almost immediately upon taking oversight responsibility for the IT [D]epartment," Sacapano started being openly hostile and demeaning toward Plaintiff, who claims that he "inappropriately propositioned" her in late October 2018.  (Id. ¶¶ 71-72.)  During this time, Plaintiff also "believed that she was being pressured to engage in illegal and unethical activities." (Id. ¶ 74.)

In October 2018, and on several ensuing occasions, Plaintiff lodged a complaint with Assistant General Counsel and Chief Human Resources Officer John DiNome and others "that she was being discriminated against and harassed, and about . . . unethical and illegal activity she [had]

observed regarding patient safety and other issues." (Id. ¶ 79; see also id. ¶¶ 90, 97.) And in November 2018, Freedman began "complain[ing] extensively about IT costing too much." (Id. ¶ 82.) On November 19, 2018, Plaintiff told Freedman in a meeting "that his actions and treatment of her regarding IT decisions, among other issues, had made it increasingly difficult to perform the job she had been hired to do." (Id. ¶¶ 82-83.) Freedman then "threatened to sue [Plaintiff] if she were to leave to work elsewhere with only thirty days['] . . . notice or before completing the IT go-live project." (Id. ¶ 83.) Plaintiff alleges that, "[a]t the conclusion of the meeting, Mr. Freedman asked [her] for a hug and kissed her on the forehead." (Id.)

After lodging a second complaint with DiNome on January 8, 2019, Plaintiff was demoted and informed that she would now be reporting to Dr. [Troy] Sybert," who she claims had previously subjected Plaintiff and other female employees to sex discrimination. (Id. ¶ 92; see also id. ¶¶ 80, 90.) On January 10, 2019, the Firm informed the Company "that all communications . . . should be directed to the [F]irm's counsel," and Freedman subsequently "accused [Plaintiff] of having engaged in wrongdoing." (Id. ¶¶ 94-95.) "Around this same time, [he] began to make false statements about [Plaintiff] to other employees," and on January 13, 2019, Plaintiff complained in writing to DiNome, Freedman, and others about the "toxic environment by the Company since her hire, and [how she had] been asked to engage in unethical and illegal conduct on countless occasions." (Id. ¶¶ 96-97.)

The following day, Plaintiff met with DiNome to discuss her complaint. (See id. ¶ 99.) At the conclusion of their meeting, he informed Plaintiff "that she was being placed on paid suspension while the Company investigated her concerns." (Id. ¶ 100.) While Plaintiff was suspended, however, the Company told one of its third-party vendors that Plaintiff had been terminated for cause. (See id. ¶¶ 102-03.)

"On January 25, 2019, [Plaintiff] received a termination letter indicating that she was terminated for cause effective immediately." (Id. ¶ 107.)  The reasons offered for her termination included, inter alia, "mismanagement, failure to take direction from [Freedman], disrespecting her peers, [and] disparaging other executives," which Plaintiff denies as "complete fabrications and not supported by the evidence." (Id. ¶¶ 107-08.)

**B.      Plaintiff's Claims Against Defendants**

On May 13, 2019, Plaintiff filed her initial Complaint against Defendants PAHS, AAHS, Paladin, and Freedman, alleging violations of the Pennsylvania Wage Payment and Collection Law, 43 Pa.C.S. § 260.1, et seq. ("PWPCL"), the Pennsylvania Whistleblower Law, 43 Pa.C.S. § 1421, et seq. ("PWL"), and Pennsylvania common law. (See Doc. No. 1 ¶ 1.)[12]  On February 28, 2020, Plaintiff filed an Amended Complaint in which she added alleged violations of federal law under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), and the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"). (See Doc. No. 22 ¶ 1.)

In the Amended Complaint, Plaintiff alleges in 13 Counts: (1) breach of contract, (2) breach of implied contract, (3) a PWPCL violation, (4) fraudulent inducement, (5) promissory estoppel/detrimental reliance, (6) unjust enrichment, (7) tortious interference with contractual relations, (8) wrongful termination, (9) a PWL violation, (10) defamation, (11) request for a declaratory judgment invalidating non-compete provisions contained in Plaintiff's employment

---

[12]   Plaintiff originally filed this case in federal court pursuant to 28 U.S.C. § 1332 diversity of citizenship jurisdiction. (See Doc. No. 1 ¶ 2.)  In the Amended Complaint, Plaintiff invokes the jurisdiction of this Court pursuant to 28 U.S.C. § 1331, which covers federal question jurisdiction, and 28 U.S.C. § 1343(4), which covers civil rights jurisdiction. (See Doc. No. 22 ¶¶ 2-3.)

contract, (12) a Title VII violation, and (13) a Section 1981 violation.  (See id. at 25-37.)[13]

Plaintiff avers that Defendants AAHS, PAHS, and Paladin, i.e., the Company, are "interchangeable business entities" with "common ownership . . . [and] management."  (Id. ¶ 20.) Plaintiff also claims that, at all relevant times, the Company "operated as one single business entity" by, for example, sharing resources, including employees.  (Id. ¶¶ 21, 23.)  Plaintiff further alleges that, "despite her Employment Agreement being with PAHS, [she] was paid by AAHS and all other agreements were between [her] and AAHS," and she "performed significant work for and/or on behalf of" the Company.  (Id. ¶ 24.)[14]

### C.    Defendants' Second Motion to Compel Arbitration and Plaintiff's Response

On March 13, 2020, Defendants filed the instant Second Motion to Compel Arbitration (Doc. No. 23), arguing that Plaintiff's claims are subject to a valid and enforceable arbitration provision under the Federal Arbitration Act ("FAA") and that this case must be stayed pending arbitration.  (See Doc. No. 23-2 at 1, 19-20.)  They assert that the arbitrability of Plaintiff's employment-related claims is apparent from the Amended Complaint such that the Rule 12(b)(6) standard applies to the instant Motion, and that the FTP Policy is valid and enforceable under Pennsylvania law.  (See id. at 9-16.)  Finally, they submit that all of Plaintiff's claims fall within the scope of the FTP Arbitration Provision.  (See id. at 16-19; see also Doc. No. 25 at 8-9.)

---

[13]   Plaintiff asserts claims in the Amended Complaint against the Company in Counts I through XIII (see Doc. No. 22 ¶¶ 132-234), and against Defendant Freedman in Counts III, IV, V, VII, and X (see id. ¶¶ 143-68, 175-83, 198-204).

[14]   In the Amended Complaint, Plaintiff refers to Defendants PAHS, AAHS, and Paladin collectively as "the Company."  (See Doc. No. 22 ¶ 1.)  And in Plaintiff's Response to the Motion, she "refers to all four Defendants"—PAHS, AAHS, Paladin, and Freedman— "collectively as the 'Company' or 'Defendants'. . . .[,] [as] [she] brings a number of claims against the corporate entities collectively due to, [inter alia], their using their corporate identities interchangeably."  (Doc. No. 24 at 4 n.3.)

On March 27, 2020, Plaintiff filed a Response in Opposition to Defendants' Motion.  (Doc. No. 24.)  Initially, she argues the defense of arbitrability is not apparent from the face of the Amended Complaint.  (See Doc. No. 24-2 at 6-8, 14-15.)  Alternatively, Plaintiff asserts she has presented reliable evidence to place the issue of arbitrability in dispute such that the Court should order discovery and apply the summary judgment standard to the Motion.  (See id. at 14-15.)  Next, she argues Defendants cannot enforce the provision to compel arbitration of her claims because they are non-signatories to the agreement.  (See id. at 14.)  Finally, Plaintiff contends her claims for defamation and tortious interference with contractual relations are not covered by the language of the FTP Arbitration Provision because they are based on Defendants' post-termination conduct. (See id. at 13.)

On April 3, 2020, Defendants filed a Reply to Plaintiff's Response in Opposition.  (Doc. No. 25.)

## III.   ANALYSIS

### A.   Applicable Standard of Review

The Court will review the Motion under the Rule 12(b)(6) standard.

Until recently, the proper standard for evaluating a motion to compel arbitration under the Federal Arbitration Act ("FAA") was unclear.  Some courts applied a Rule 12(b)(6) motion to dismiss standard, while others applied a Rule 56 motion for summary judgment standard.  This dichotomy was clarified by the Third Circuit Court of Appeals in Guidotti v. Legal Helpers Debt Resolution, L.L.C., 716 F.3d 764 (3d Cir. 2013).

In Guidotti, the Third Circuit explained that the inconsistent application of the two standards stemmed from "the competing purposes of the FAA, and by the values underlying contract interpretation."  Id. at 773.  The Court found that "the FAA places considerable emphasis on 'efficient and speedy dispute resolution,'" favoring the application of a Rule 12(b)(6) motion

to dismiss standard and no discovery process.  Id. (quoting Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 221 (1985)).  However, the United States Supreme Court has "reject[ed] the suggestion that the overriding goal of the Arbitration Act was to promote the expeditious resolution of claims."  Id. (alteration in original) (quotation marks omitted) (quoting Dean Witter, 470 U.S. at 219).  Thus, as Guidotti noted, this indicates that discovery should be permitted and a motion for summary judgment standard may apply.  Id. at 774.

The Guidotti court also found, however, that "[b]ecause 'arbitration is a matter of contract between the parties,' a judicial mandate to arbitrate must be predicated upon the parties' consent." Id. at 771 (citation and quotation marks omitted).  In an effort to ensure that an order to arbitrate is based on the parties' consent, and to enforce the provisions of the FAA, the court noted that the standard of review for motions to compel arbitration should be tied to the strength of the complaint and its supporting documents.  The court therefore held that:

> [W]hen it is apparent, based on "the face of a complaint, and documents relied upon in the complaint," that certain of a party's claims "are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay." . . . But if the complaint and its supporting documents are unclear regarding the agreement to arbitrate, or if the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue, then "the parties should be entitled to discovery on the question of arbitrability before a court entertains further briefing on [the] question." . . . After limited discovery, the court may entertain a renewed motion to compel arbitration, this time judging the motion under a summary judgment standard.  In the event that summary judgment is not warranted because "the party opposing arbitration can demonstrate, by means of citations to the record," that there is "a genuine dispute as to the enforceability of the arbitration clause," the "court may then proceed summarily to a trial regarding 'the making of the arbitration agreement or the failure, neglect, or refusal to perform the same,' as Section 4 of the FAA envisions."

Id. at 776 (quoting Somerset Consulting, LLC v. United Cap. Lenders, LLC, 832 F. Supp. 2d 474, 482 (E.D. Pa. 2011)); see also Sanford v. Bracewell & Guiliani, LLP, 618 F. App'x 114, 117 (3d Cir. 2015).

14

Stated otherwise, a district court will review a motion to compel arbitration under the Rule 12(b)(6) standard "if arbitrability is apparent on the face of the complaint and incorporated documents, and the opposing party fails to set forth reliable, additional evidence showing that it did not intend to be bound by the arbitration clause." Richards v. Am. Acad. Health Sys., LLC., No. 20-00059, 2020 WL 2615688, at *3 (E.D. Pa. May 22, 2020). "If, however, arbitrability is not apparent on the face of the complaint and its supporting documents, or the opposing party has come forth with reliable evidence that it did not intend to be bound by the clause, the Court will order discovery on the issue of arbitrability and then consider the renewed motion" under the Rule 56 standard. Id.

### 1. Arbitrability is Apparent on the Face of the Amended Complaint and Supporting Documents

The arbitrability of Plaintiff's claims is apparent on the face of the Amended Complaint and supporting documents. In determining whether the arbitrability of Plaintiff's claims is apparent, district courts consider "the face of a complaint, and documents relied upon [there]in." Guidotti, 716 F.3d at 776 (citation and quotation marks omitted). Accordingly, an arbitration agreement need not be attached to the complaint in order to be "apparent." See Richards, 2020 WL 2615688, at *3 n.5 ("The contract containing the arbitration clause does not need to be attached to the operative complaint."). "Rather, it simply needs to be relied upon or incorporated in the complaint." Id.[15]

---

[15] See also Lawson v. City of Philadelphia, No. 18-1912, 2019 WL 934976, at *2 (E.D. Pa. Feb. 25, 2019) (alterations in original) (quoting CardioNet, 751 F.3d at 168 n.2) ("An arbitration clause may be deemed 'apparent' even when a 'contract[], though not appended to the Complaint, [is] integral to, and referenced in, the Complaint.' . . . Accordingly, when 'the arbitration clause at issue appears in a contract relied upon in the Complaint, [the court] resolve[s] the motion to compel arbitration under a motion to dismiss standard[.]'"); Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) ("[Under] Rule 12(b)(6) . . . a court must consider

In the instant case, Defendants submit that arbitrability of Plaintiff's claims is apparent on the face of the complaint and supporting documents because the Amended Complaint "references and relies on the Offer Letter, . . . which explicitly incorporated the FTP [Policy] and its mandatory arbitration provision." (Doc. No. 23-2 at 10.)  Thus, Defendants argue that the Court should apply the Rule 12(b)(6) standard in resolving the Motion.  (See id. at 9-10.)  Conversely, Plaintiff contends that the Amended Complaint and its supporting documents do not "facially establish arbitrability" and the Court must therefore order discovery on the issue and review the Motion under the Rule 56 standard.  (Id. at 14-15.)

Here, the FTP Arbitration Provision was both relied upon and incorporated in the Amended Complaint.  The parties do not dispute that the Offer Letter was explicitly referenced in the Amended Complaint (see Doc. Nos. 23-2 at 10; 24-2 at 4) or that the FTP Policy containing the arbitration provision was "attached to and referenced in [Plaintiff's] Offer Letter." (Doc. No. 24-2 at 4 n.4; see also Doc. No. 23-2 at 10, Ex. 1 ¶ 6 & Ex. A at 2.)

Further, the Amended Complaint alleges Defendants committed various torts and statutory violations in connection with Plaintiff's employment with PAHS and subsequent termination.  (See Doc. No. 22 ¶ 1; see also Doc. No. 24-2 at 5.)  Plaintiff also claims the Company offered her the CIO position pursuant to a written "Offer Letter" setting forth the terms and conditions of Plaintiff's employment with the Company.  (See Doc. No. 22 ¶¶ 53-58.)[16]  And Plaintiff even relies upon the Offer Letter in suing the Company for breach of contract (Count I).  (See id. ¶¶

---

only the complaint, exhibits attached to the complaint . . . as well as undisputedly authentic documents if the complainant's claims are based upon those documents.").

[16]  As discussed in Section II.A, supra, attached to the Offer Letter were the following enclosures: (1) the FTP Policy, which contains the FTP Arbitration Provision; (2) the Acknowledgment Form; and (3) the RCA.  These enclosures were submitted as exhibits to the parties' briefs. See supra note 4.

132-37) (seeking damages for breach of promises in the Offer Letter to pay Plaintiff severance pay and monetary bonus for the IT go-live project). Plaintiff includes in the Amended Complaint some of the terms and conditions of the Offer Letter, such as her salary and benefits, while excluding others. (See id.) One of the excluded conditions is the FTP's mandatory arbitration provision. (See id.) The Offer Letter, however, expressly references this provision, providing that: "[b]y accepting this offer, as a condition of employment, [Plaintiff] agree[s] to be bound by the [FTP], including its mandatory arbitration provision, a copy of which is enclosed with this letter." (Doc. No. 23-2 at 7; see also id., Ex. 1 ¶ 6 & Ex. A at 2.) Moreover, the Offer Letter explicitly states that the letter, "along with its enclosures, contains the entire agreement between [Plaintiff] and PAHS." (Doc. No. 23-2, Ex. 1 ¶ 6 & Ex. A at 2.) Thus, the Amended Complaint incorporates the Offer Letter and the enclosed FTP Policy, including the mandatory arbitration provision contained therein.

Because the FTP Arbitration Provision "appears in a contract relied upon in the [c]omplaint," arbitrability is apparent on the face of the Amended Complaint and supporting documents. CardioNet, Inc. v. Cigna Health Corp., 751 F.3d 165, 168 n.2 (3d Cir. 2014) (resolving motion to compel under 12(b)(6) standard "[b]ecause the arbitration clause at issue appear[ed] in a contract relied upon in the Complaint").

### 2. Plaintiff Has Not Presented Reliable Evidence Sufficient to Place the Agreement to Arbitrate in Issue

Plaintiff does not set forth reliable, additional evidence sufficient to place the arbitration agreement in issue. Under Guidotti, if an opposing party responds to a motion to compel arbitration with "additional facts sufficient to place the agreement to arbitrate in issue," 716 F.3d at 776, "the Court will order discovery on the issue of arbitrability and then consider the renewed motion pursuant to the Rule 56 summary judgment standard." Richards, 2020 WL 2615688, at *3

(citations omitted).  "Discovery is not warranted," however, "without reliable evidence that 'is more than a naked assertion . . . that [the party] did not intend to be bound by the arbitration clause.'"  Id. at *3 n.5 (quotation marks omitted) (quoting Guidotti, 716 F.3d at 774).

Here, Plaintiff contends that discovery on the issue of arbitrability is warranted and the Rule 56 standard should be applied because she has presented evidence that the FTP Arbitration Provision is unconscionable and therefore unenforceable.  (See Doc. No. 24-2 at 8-13.)  In response, Defendants argue that the FTP is neither procedurally nor substantively unconscionable but instead is valid and enforceable as to all of Plaintiff's claims.  (See Doc. No. 25 at 2-7.)  They submit that because Plaintiff has not responded to the Motion with reliable evidence sufficient to place the FTP Policy in dispute, she is not entitled to discovery on the issue and the Court should apply the Rule 12(b)(6) standard.  (See id.; see also Doc. No. 23-2 at 12-13.)

As discussed extensively in Section III.C.1, infra, the Court has concluded that the FTP Arbitration Provision is not unconscionable and instead is a valid and enforceable arbitration agreement under Pennsylvania law.  Accordingly, Plaintiff has failed to set forth reliable, additional evidence sufficient to place the FTP Arbitration Provision in issue.

In sum, because arbitrability is apparent on the face of the Amended Complaint and the Offer Letter relied upon therein, and because Plaintiff has not responded to the Motion with additional facts sufficient to place the FTP Arbitration Policy in issue, the Court will review the Motion under the Rule 12(b)(6) standard.  Under this standard, the Court accepts as true all factual allegations in the Amended Complaint and its supporting documents.  See Guidotti, 716 F.3d at 776; CardioNet, 751 F.3d at 168 n.2 (in applying the Rule 12(b)(6) standard to a motion to compel arbitration, the court "accept[s] as true the factual allegations set forth in the Complaint" and may "consider the substance of the contracts that ostensibly compel arbitration.").

**B.** **Defendants May Enforce the FTP Arbitration Provision as Non-Signatories Under Reverse Equitable Estoppel**

In opposing arbitration, Plaintiff contends that Defendants are not parties to the FTP Policy and therefore cannot compel arbitration of her claims against them.  (See Doc. No. 24-2 at 14.)  In the Amended Complaint, Plaintiff states that her "employment agreement" was with Defendant PAHS only.  (Doc. No. 22 ¶¶ 1, 22.)[17]  Thus, in her Response to the Motion, she argues that she agreed to arbitrate her claims "with respect to [PAHS] only, and there was no [arbitration] agreement between [Plaintiff] and the remaining Defendants."  (Doc. No. 24-2 at 2.)  Accordingly, she claims that Defendants, as non-signatories to the FTP Policy, cannot enforce the FTP Arbitration Provision against her.  (Id. at 14.)

In their Reply, Defendants submit that the FTP Arbitration Provision covers Defendants AAHS, Paladin, and Freedman because, by its plain terms, the FTP Policy expressly applies to "[AAHS], its consolidated subsidiaries, parents, affiliates, . . . and other entities owned or operated by [AAHS]."  (Doc. No. 25 at 9; see also Doc. No. 23-2, Ex. 1 ¶ 7 & Ex. B at 1.)  They further argue that because Plaintiff "brings a number of claims against the corporate entities collectively due to, among other things, their using their corporate identities interchangeably," AAHS, Paladin, and Freedman may compel arbitration of Plaintiff's claims despite being non-signatories to the FTP Policy.  (Doc. No. 24-2 at 4 n.3; see also Doc. No. 25 at 9-10.)

The FAA "expresse[s] a strong federal policy in favor of resolving disputes through arbitration."  Richards, 2020 WL 2615688, at *4 (quoting Century Indem. Co. v. Certain Underwriters at Lloyd's London, 584 F.3d 513, 522 (3d Cir. 2009)).  Accordingly, "[a] court may

---

[17]  Elsewhere in the Amended Complaint and in her Response to the Motion, however, Plaintiff states that she "was offered the position of [CIO] with the Company pursuant to a written employment agreement – 'the Offer Letter'."  (Doc. No. 22 ¶ 53; see also Doc. No. 24-2 at 4.)

compel arbitration even as to non-signatories of the arbitration agreement [or provision] under applicable state law doctrines of 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third party beneficiary theories, waiver and estoppel.'" Id. (quoting Noye v. Johnson & Johnson Servs., Inc., 765 F. App'x 742, 745-48 (3d Cir. 2019)).

Here, it is undisputed that Pennsylvania law applies. (See Doc. Nos. 23-2 at 23; 24-2 at 9.) In the Motion, Defendants seek to compel Plaintiff to be bound by the FTP Arbitration Provision based on the theory of alternative equitable estoppel. "Under Pennsylvania law 'alternative equitable estoppel,' or 'reverse estoppel,' allows 'non-signatories to an arbitration agreement [to] enforce such an agreement when there is an obvious and close nexus between the non-signatories and the contract or the contracting parties.'" Richards, 2020 WL 2615688, at *4 (alteration in original) (quoting Noye, 765 F. App'x at 746). In Noye v. Johnson & Johnson Services, Inc., 765 F. App'x 742 (3d Cir. 2019), the Third Circuit "specified that there need only be a 'close nexus' between either (i) the non-signatory and a signatory, or (ii) the non-signatory and the contract." Richards, 2020 WL 2615688, at *4 (emphasis in original) (quoting Noye, 765 F. App'x at 746 nn. 6-7); see also id. (stating the court in Noye "adopt[ed] the single factor test" to replace "the conjunctive test . . . .").

In Noye, the Third Circuit found an "obvious and close nexus" between non-signatory Johnson & Johnson ("J&J") and the contract, and between J&J and the signatories to the contract. 765 F. App'x at 747-48. Plaintiff Noye contracted with a temporary staffing agency for placement as an operations supervisor at J&J. Id. at 743-44. Prior to Noye's placement at J&J, he and the agency executed several documents, including arbitration and employment agreements and background check forms. Id. at 747. The Third Circuit applied reverse equitable estoppel to bind Noye to arbitrate his claims against J&J pursuant to his agreement with the agency because:

> [The agency] provide[d] recruitment and placement services to J&J. Noye interviewed for a placement with J&J at [the agency's] job fair, and Noye received his offer to work at J&J through a[n] [agency] recruiter in an email bearing the subject line "Offer from J&J through [Agency] Services." [The Agency] was authorized to use J&J logos and trademarks on employment forms it relayed to Noye, and Noye received information and documents related to the onboarding process from [the agency] in an email with the subject line "[Agency] Services J[&]J [Hiring] Documents. . . ." These documents, including the [a]rbitration and [e]mployment [a]greements and background check forms, were the vehicles to place Noye, a[n] [agency] employee, with J&J.
>
> . . .
>
> Moreover, Noye's complaint often refers to [the Agency] and J&J collectively as "Defendants," and accuses them of the same conduct . . . .

Id.

Here, "[a]lthough the Third Circuit has adopted the single factor test, . . . there is an obvious and close nexus" between Defendants and the arbitration agreement (the FTP Policy), and Defendants and the signatories (Plaintiff and non-parties AAHS, Paladin, and Freedman). Richards, 2020 WL 2615688, at *4. Thus, accepting as true all allegations in the Amended Complaint, there is an obvious and close nexus between the non-signatory Defendants and the FTP Policy.

First, as to Defendants AAHS and Paladin, Plaintiff's breach of contract claim (Count I) against these entities establishes an obvious and close nexus with the FTP Policy. (See Doc. No. 22 ¶¶ 132-137.) In Count I, Plaintiff asserts claims against AAHS and Paladin (as well as PAHS) for breach of the "written employment agreement," i.e., the Offer Letter, and for violations of promises contained therein. (Id. ¶ 53.) Because the FTP Policy and its arbitration provision are indisputably part of the Offer Letter, see Section II.A, supra, Plaintiff's breach of contract claims against AAHS and Paladin provide the requisite nexus. See Richards, 2020 WL 2615688, at *4; see also Noye, 765 F. App'x at 746 (alterations in original) (citations omitted) ("When examining

the nexus with the contract, some courts consider whether the claims at issue are 'inextricably entwined with the [c]ontract,' . . . or 'stem[ ] from the same incident and implicate[ ] identical legal principles[.]'"); <u>Devon Robotics v. Deviedma</u>, No. 9-3552, 2009 WL 4362822, at *4 (E.D. Pa. Nov. 30, 2009) ("[Reverse estoppel] generally applies when a signatory to the written agreement must rely on the terms of the agreement to assert its claim against the non-signatory such that the signatory's claims make reference to or presume the existence of the written agreement, or the signatory's claims arise out of and relate directly to the written agreement.").

Second, as to Defendant Freedman, Plaintiff's claims against him provide the requisite nexus. The claims are for violation of the PWPCL (Count III), fraudulent inducement (Count IV) and promissory estoppel/detrimental reliance (Count V). (<u>See</u> Doc. No. 22 ¶¶ 143-53, 154-61, 162-68.) Under Count III, Plaintiff claims Freedman violated the PWPCL by failing to compensate her pursuant to several provisions of the Offer Letter, including "severance pay of 6 months" and reimbursement expenses. (<u>Id.</u> ¶¶148; <u>see also id.</u> ¶¶ 143-53.)

Regarding Count IV, Plaintiff alleges she "reli[ed] upon the promises contained in the Offer Letter" in resigning from her position with a world-class organization, selling her house, and relocating to begin working for the Company. (<u>Id.</u> ¶ 58.) These facts form the basis of Plaintiff's fraudulent inducement claim against Freedman in Count IV. (<u>See id.</u> ¶¶ 154-61) (claiming Freedman made fraudulent misrepresentations regarding the terms and conditions of Plaintiff's employment upon which she relied, inducing her to "leave a lucrative position and relocate" and resulting in damages set forth in the Amended Complaint).

In Count V, Plaintiff refers to promises contained in the Offer Letter regarding 6 months of severance pay and a "significant bonus upon completion of the IT go-live project" in asserting a claim against Freedman for promissory estoppel/detrimental reliance. (<u>See id.</u> ¶ 164; <u>see also id.</u>

¶¶ 162-63, 165-68.)  Accordingly, Plaintiff's reliance on the Offer Letter in asserting claims against non-signatories AAHS and Paladin in Count I and non-signatory Freedman in Counts III through V establishes an "obvious and close nexus" between Defendants and the FTP Policy containing the arbitration provision.  <u>Richards</u>, 2020 WL 2615688, at *4.

The Amended Complaint also demonstrates an obvious and close nexus between Defendants and signatory PAHS.  Plaintiff alleges non-signatory Defendants AAHS and Paladin and signatory PAHS "used their corporate identities interchangeably" in "operat[ing] as one single business entity" and "shared resources, including employees, during [Plaintiff's] employment." (Doc. No. 22 ¶¶ 21-23.)  Further, Plaintiff claims she "was paid by AAHS" and "performed significant work for and/or on behalf of PAHS, AAHS and Paladin."  (<u>Id.</u> ¶ 24.)  During this time, non-signatory Defendant Freedman was the "Owner, Chairman and [CEO] of PAHS and AAHS" who supervised Plaintiff in her role as CIO.  (<u>See id.</u> ¶ 1.)  Plaintiff avers in her Response that PAHS is "a subsidiary of AAHS, which is in turn a subsidiary of Paladin and all three of which are owned by Mr. Freedman."  (Doc. No. 24-2 at 10.)  Thus, the Amended Complaint also establishes the requisite nexus between the non-signatory Defendants and signatory PAHS.

For these reasons, Defendants, despite being non-signatories to the FTP Policy, can enforce the arbitration clause as to Plaintiff under the doctrine of alternative equitable estoppel.

## C.     Plaintiff's Claims are Subject to a Valid and Enforceable Arbitration Clause

Plaintiff's claims against Defendants are subject to a valid and enforceable arbitration provision such that this case will be stayed pending arbitration.  To determine whether a party may be compelled to arbitrate under the FAA, the Court "first consider[s] (1) whether there is a valid agreement to arbitrate between the parties and, if so, (2) whether the merits-based dispute in question falls within the scope of that valid agreement."  <u>Sanford</u>, 618 F. App'x at 117 (quotation

marks omitted) (quoting Flintkote Co. v. Aviva PLC, 769 F.3d 215, 220 (3d Cir. 2014)).  "When determining both the existence and the scope of an arbitration agreement, there is a presumption in favor of arbitrability."  Trippe Mfg. v. Niles Audio Corp., 401 F.3d 529, 532 (3d Cir. 2005).

### 1.    The Arbitration Clause is Valid and Enforceable

The FTP Arbitration Provision is valid and enforceable under Pennsylvania law.  Under the FAA, the Court must enforce an arbitration agreement that is otherwise valid and enforceable under ordinary contract principles of the relevant state law.  See China Minmetals Materials Imp. & Exp. Co., Ltd. v. Chi Mei Corp., 334 F.3d 274, 290 (3d Cir. 2003); Alexander v. Anthony Int'l, L.P., 341 F.3d 256, 264 (3d Cir. 2003); Parilla v. IAP Worldwide Servs., VI, Inc., 368 F.3d 269, 275-76 (3d Cir. 2004).  In doing so, the Court may separately assess the validity or enforceability of an arbitration clause within an otherwise valid agreement.  See Quilloin v. Tenet HealthSystem Philadelphia, Inc., 673 F.3d 221, 229 (3d Cir. 2012) ("[R]egardless of whether a contract as a whole is valid, agreements to arbitrate are severable from a larger contract, and may therefore be separately enforced and their validity separately determined.").

As previously stated, the parties do not dispute that Pennsylvania law governs the instant agreement.  (See Doc. Nos. 23-2 at 23; 24-2 at 9.)  Nor do they dispute the validity of the FTP Policy and Arbitration Provision.  (See Doc. Nos. 23-2 at 12-16; 24-2 at 10.)  Rather, Plaintiff argues the FTP Arbitration Provision is unenforceable because it is unconscionable and for this reason should be severed from the rest of the agreement.  (See Doc. No. 24-2 at 10.)

Under Pennsylvania law, a plaintiff must show both procedural and substantive unconscionability in order to void an arbitration provision.  See Hopkins v. New Day Fin., 643 F. Supp. 2d 704, 716 (E.D. Pa. 2009); Harris v. Green Tree Fin. Corp., 183 F.3d 173, 181 (3d Cir. 1999).  Procedural unconscionability refers to the process by which an agreement is entered into. See Zimmer v. CooperNeff Advisors, Inc., 523 F.3d 224, 228 (3d Cir. 2008); Hopkins, 643 F.

Supp. 2d at 716-17.  Substantive unconscionability asks whether the provision unreasonably favors the party asserting it.  See Quilloin, 673 F.3d at 230.

In her Response to the Motion, Plaintiff argues the FTP Arbitration Provision is both procedurally and substantively unconscionable.  (See Doc. No. 24-2 at 8-13.)  She contends the provision is procedurally unconscionable because it is an unenforceable adhesion contract.  (See id. at 10-11.)  As to substantive unconscionability, Plaintiff argues that the terms of the FTP Arbitration Provision grossly favor Defendants by reserving their right to litigate its potential claims against Plaintiff while forcing Plaintiff to arbitrate her potential claims against them.  (See id. at 11-13.)

### a.    The Arbitration Clause is Not Procedurally Unconscionable

"The Pennsylvania Supreme Court has defined procedural unconscionability as the 'absence of meaningful choice on the part of one of the parties.'"  Hopkins, 643 F. Supp. 2d at 717 (quoting Witmer v. Exxon Corp., 434 A.2d 1222, 1228 (Pa. 1981)).  "Procedural unconscionability is generally found where there is a contract of adhesion—a contract prepared by a party with excessive bargaining power and presented to the other party on a 'take it or leave it' basis."  Id. (citing Denlinger, Inc. v. Dendler, 608 A.2d 1061, 1068 (Pa. 1992)).  However, a disparity in bargaining power alone does not necessarily rise to the level of procedural unconscionability.  See Quilloin, 673 F.3d at 235; see also Denlinger, 608 A.2d at 1067 (quotation marks omitted) (quoting Witmer, 434 A.2d at 1228) (stating that Pennsylvania Supreme Court and federal courts have "refused to hold contracts unconscionable simply because of a disparity in bargaining power.").  "The general test is whether the party challenging the agreement had any meaningful choice regarding the acceptance of its provisions."  Hopkins, 643 F. Supp. 2d at 717.

Plaintiff contends that the FTP Arbitration Provision is an unenforceable adhesion contract

because, as an employee contracting with a sophisticated corporate entity, she was in a weaker bargaining position than Defendants and because she was required to accept the provision as a condition of employment on a "take it or leave it" basis.  (See Doc. No. 24-2 at 10-11.)

In response, Defendants submit that the allegations in the Amended Complaint detailing an extensive recruitment and negotiation process between the parties prior to Plaintiff's acceptance of the FTP Arbitration Provision "dispel[] any notion that [Plaintiff] was somehow in a weaker bargaining position than [Defendants]."  (Doc. No. 25 at 4.)  They argue that Plaintiff "did not lack a meaningful choice in accepting the challenged arbitration provision and the FTP [Policy] was not procedurally unconscionable."  (Id.) (footnote omitted).

In Hopkins v. New Day Financial, 643 F. Supp. 2d 704 (E.D. Pa. 2009), this Court found an arbitration provision presented to employees of a mortgage company was unconscionable because, inter alia, the employees lacked meaningful choice about whether to accept the provision. Id. at 718.  The Court found that the plaintiffs, though mostly college educated, lacked sufficient bargaining power because they "did not have alternative employment options and had already committed to working, or were working" for the defendant when they were presented with the arbitration agreement.  Id.  Moreover, this Court concluded that the "take it or leave it" nature of the agreement was shown, as the plaintiffs believed their refusal to sign the mandatory arbitration provision would result in their termination.  Id.

Under the circumstances, the Hopkins plaintiffs were unable to adequately review the arbitration agreement or consult with counsel prior to signing it, as they were directed to execute a large pile of documents containing the agreement, were given between 30 minutes and one hour total to do so and were told that none of the documents could leave the room with them.  See id. at 709-13.  Moreover, the employees felt as though they could not ask questions about the provision

and believed that if they refused to sign it, they would be fired.  See id.  Thus, the degree of economic compulsion motivating the plaintiffs' acceptance of the provision in Hopkins was clear.

This case is distinguishable from Hopkins because Plaintiff was in an equal, if not greater, bargaining position than Defendants.  Unlike the college-educated plaintiffs in Hopkins, Plaintiff here is a "highly skilled and accomplished [IT] executive with extensive experience in her field." (Doc. No. 22 ¶ 25.)  Prior to her employment with the Company and her acceptance of the terms of employment, Plaintiff was an Associate CIO at a "nationally renowned healthcare organization . . . consistently among the top-grossing hospitals in the United States and highly regarded in the area of technological management systems."  (Id. ¶¶ 25-26.)

The Amended Complaint recounts an extensive recruitment and negotiation process between the parties before Plaintiff accepted the Offer Letter and FTP Policy.  (See id. ¶¶ 31-36.) Plaintiff alleges Defendant Freedman "aggressively recruited" her for the CIO position over a period of many months.  (Id. ¶ 31; see also id. ¶¶ 32-36.)  During this period, she successfully negotiated terms of her employment with the Company, including a total annual compensation package "commensurate with her expectations," which included a "substantial" annual salary and "significant" bonuses.  (Id. ¶¶ 55-56.)  She also had the opportunity to meet with the Company's executive board to better understand its financial position, which aided Plaintiff in her decision about whether to leave her current position with a "world-class organization."  (Id. ¶ 44; see also id. ¶ 42.)

The facts further show that Defendants may have been in a weaker bargaining position than Plaintiff, as the Company was relying heavily on her industry expertise in spearheading the IT go-live project.  (See id. ¶¶ 47, 56.)  This intensive project, which Plaintiff would oversee as the new CIO, would require a complete overhaul and reconstruction of the Company's current IT systems

in order to "build a new foundation/department."  (Id. ¶ 47.)

Plaintiff and Freedman discussed Freedman's goals and expectations for this project and the IT Department in a one-on-one meeting before Plaintiff accepted the CIO position.  (See id. ¶¶ 43-48.)  The Amended Complaint states that Freedman understood Plaintiff would be leaving a "nationally renowned" company in order to help him build a new IT system for his "start-up healthcare organization."  (Id. ¶¶ 31, 42, 44.)  In doing so, Plaintiff would be potentially responsible for an IT budget of approximately $6,000,000, but Freedman told her that "he would defer to [Plaintiff's] expertise in this regard" and "would make the right investments" in the IT Department because it was "so critical to the Company's needs."  (Id. ¶¶ 46, 48.)  For these reasons, the Amended Complaint, when viewed in the light most favorable to Plaintiff, shows that she wielded significant bargaining power in negotiating her CIO position with the Company.

In addition, the FTP Arbitration Provision was not presented to Plaintiff on a "take it or leave it basis."  Plaintiff argues that Defendants presented her with the provision on a "take it or leave it basis" because she was required to sign it as a condition of her employment with the Company, and its language shows it is a "generic contract presented to each employee" without any opportunity to negotiate its terms.  (See Doc. No. 24-2 at 10-11.)  In their Reply, Defendants submit that the Amended Complaint does not allege that Plaintiff "attempted, but was not permitted, to negotiate the inclusion of the FTP [Arbitration Provision] the same way she negotiated her salary and other terms."  (Doc. No. 25 at 4 n.3.)

Unlike the plaintiffs in Hopkins, Plaintiff was not already financially committed to the Company when she signed the agreement, and she had an opportunity to review the provision and consult with counsel.  The Amended Complaint alleges that, "[i]n reliance upon the promises contained in the Offer Letter, and the other promises made to her by . . . Freedman, [Plaintiff]

28

resigned from her stable position with a world-class organization, sold her house, relocated and began working for the Company." (Doc. No. 22 ¶ 58.) Thus, when presented with the FTP Policy and its arbitration provision, Plaintiff was employed as a technology executive at an organization "consistently among the top-grossing hospitals in the United States and highly regarded in the area of technological management systems." (Id. ¶ 26.) Because Plaintiff did not resign from her current position until after she executed the Offer Letter and Acknowledgment Form, she was not financially committed to the Company at the time she accepted the FTP Arbitration Provision.

Moreover, in the Amended Complaint, Plaintiff alleges she received a copy of the Offer Letter on July 20, 2018 (see Doc. No. 22 ¶ 53) and, in her Response to the Motion, she does not dispute that she countersigned it on the same day. (See Doc. Nos. 23-2, Ex. 1 ¶ 6; Doc. No. 24-2 at 4.) As noted, the FTP Policy and Arbitration Provision were attached to the Offer Letter, see Section II.A, supra, and Plaintiff admits executing the Acknowledgment Form in which she "acknowledged receiving a copy of the [FTP Policy] and agreed to be bound by it." (Doc. No. 23-2, Ex. 1 ¶ 8; see also Doc. No. 24-2 at 4.) But, unlike the plaintiffs in Hopkins, Plaintiff was provided with a copy of the agreement and had an opportunity to review it and consult counsel prior to signing it. She was not required to sign it on the same day. Therefore, "[t]his is not a case where a plaintiff with 'limited educational background, narrow options for employment, and little bargaining power is presented with an agreement on a take-it or leave-it basis.'" Lucey v. FedEx Ground Package Systems, Inc., 305 F. App'x 875, 878 (3d Cir. 2009).

Because Plaintiff was in a strong bargaining position with Defendants and was not presented with the FTP Arbitration Provision on a "take it or leave it basis," the agreement is not procedurally unconscionable.

                    **b.      The Arbitration Clause is Not Substantively Unconscionable**

        As noted above, Plaintiff must establish both procedural and substantive unconscionability

to void the FTP Arbitration Provision.  Despite the FTP Arbitration Provision lacking procedural

unconscionability, the Court will still address whether the Provision was substantively

unconscionable.  "Substantive unconscionability refers to contractual terms that are unreasonably

or grossly favorable to one side and to which the disfavored party does not assent."  Harris, 183

F.3d at 181.

        Plaintiff argues the FTP Arbitration Provision is substantively unconscionable because it

"unilaterally provides PAHS the benefits of arbitration for all of [Plaintiff's] potential claims,

while reserving to PAHS the right to seek relief in court for claims that are important to PAHS."

(Doc. No. 24-2 at 11.)  Specifically, she asserts the provision requires arbitration of "nearly all of

the potential claims and controversies" that Plaintiff would likely bring against PAHS as her

employer, while PAHS, on the other hand, "has reserved to itself the ability to litigate . . . . all of

the claims that it might envision bringing against" Plaintiff as its employee for breach of the RCA's

restrictive covenants.  (Id. at 12-13.)[18]

        In response, Defendants argue that Plaintiff's argument is "contradict[ed] [by] the plain

text of the [provision], which requires both [Plaintiff] and PAHS to arbitrate all employment-

related disputes and binds both parties to the result."  (Doc. No. 25 at 4-5.)  Moreover, they submit

that the RCA's reservation of Defendants' right "to bring certain claims in court does not render

the [FTP Arbitration Provision] substantively unconscionable."  (Id. at 5.)

        Here, the provision is not substantively unconscionable for two reasons.  First, the FTP

---

[18]   The RCA contains non-disclosure, non-competition, and non-solicitation provisions.  (See
       Doc. No. 24-3 ¶¶ 2-4.)

Arbitration Provision binds both parties, by providing that:

> ***An employee's decision to accept employment or to continue employment constitutes his or her agreement to be bound by the FTP. Likewise, the Company agrees to be bound by the FTP. This mutual agreement to arbitrate claims means that both the employee and the Company are bound*** to use the FTP process as the only means of resolving employment-related disputes, ***and thereby agree to forego any right they each may have had to a jury trial on issues covered by the FTP.***

(Doc. No 23-2, Ex. 1 ¶ 7 & Ex. B at 1) (emphasis added).

The provision clearly states that both Plaintiff, as employee, and the Company, as employer, "agree[] to be bound by the [FTP Policy]." (Id.)  The FTP Policy contains the FTP Arbitration Provision, which requires arbitration of all "disputes, claims or controversies that a court of law would be authorized or have jurisdiction over to grant relief and that in any way arise out of, relate to or are associated with [Plaintiff's] employment with the Company or the termination of employment."  (Id., Ex. 1 ¶ 7 & Ex. B at 3; see also Doc. No. 24-2 at 12.) Accordingly, the FTP Arbitration Provision requires both Plaintiff and Defendants to arbitrate all claims related to Plaintiff's employment and/or termination.

Second, Defendants have an apparent business justification for excluding from mandatory arbitration equitable relief with respect to a breach or potential breach of the RCA.  See Salley v. Option One Mortgage Corp., 925 A.2d 115, 128-29 (Pa. 2007) (holding that one party's reservation of court access for foreclosure actions does not create a presumption of unconscionability where there is an "apparent business justification" for excluding such actions from arbitration).  As written in the RCA:

> [Plaintiff] agrees and acknowledges that the ***injury the [Company] would suffer because of breach of the Non-Disclosure, Non-Solicitation or Non-Competition in [sic] provisions would be irreparable and that an award of monetary damages for breach would be an inadequate remedy***.  Consequently, the [Company] shall have the right . . . to obtain injunctive relief from any court or arbitrable tribunal of competent jurisdiction to restrain any breach or threatened breach or to specifically enforce any provision of the Agreement . . .

(Doc. No. 24-3 ¶ 5) (emphasis added).

Here, the "apparent business justification" for giving the Company the right "to obtain injunctive relief" or "specifically enforce" the RCA is the irreparable injury that it would suffer from any breach or potential breach of the RCA's provisions. (Id.); see also Rivera v. PetSmart, Inc., No. 18-2121, 2018 WL 5045380, at *6 n.8 (E.D. Pa. Oct. 17, 2018) (upholding arbitration clause excluding "claims for injunctive relief to protect confidential information or to enforce restrictive covenants"). Moreover, the agreement reserves to PAHS the right to litigate only one cause of action—"injunctions related to the breach of the RCA." (Doc. No. 25 at 5).

For the reasons set forth above, the terms of the arbitration agreement do not unreasonably favor Defendants and the FTP Arbitration Provision is not substantively unconscionable. Because the parties do not dispute that the arbitration agreement is a valid contract and the Court finds that there is no basis to find that it is unconscionable, the FTP Arbitration Provision is valid and enforceable.

### 2. Plaintiff's Claims Fall Within the Scope of the Arbitration Clause

Because the FTP Arbitration Provision is valid and enforceable under Pennsylvania law, the final inquiry in resolving the Motion is whether Plaintiff's claims fall within the scope of that provision. See Trippe Mfg., 401 F.3d at 532. Since the FTP Arbitration Provision covers all claims asserted in the Amended Complaint, the Court must compel arbitration.

The FTP Arbitration Provision provides that it:

> ***[C]overs all disputes relating to or arising out of an employee's employment with the Company or the termination of employment***. . . . Examples of the type of disputes or claims covered by the FTP include, but are not limited to, . . . tort claims or any other legal claims and causes of action recognized by local, state or federal law or regulations.

(Doc. No 23-2, Ex. 1 ¶ 7 & Ex. B at 1) (emphasis added).

Despite the scope of coverage, Plaintiff contends that her claims for interference with prospective contractual relations (Count VII) and defamation (Count X) are not covered by the "language requiring . . . all claims relating to or arising from [Plaintiff's] employment or her termination be arbitrated" because they arise out of post-termination conduct by Defendants.  (See Doc. No. 24-2 at 13.)  Thus, she argues, the Court should not compel arbitration of these claims. (See id.)

In response, Defendants set forth established Third Circuit law revealing that nearly identical language to that contained in the FTP Arbitration Provision has been held to "encompass[] claims that arise after an employee is terminated, so long as the claim 'relat[es] to or aris[es] out of' the employee's employment or termination."  (Doc. No. 25 at 8); see also Wood v. Prudential Ins. Co. of America, 207 F.3d 674, 680-81 (3d Cir. 2000) (holding agreement requiring arbitration of "any dispute, claim or controversy . . . . arising out of the [plaintiff's] employment or termination of employment" covered post-termination claims for defamation and intentional infliction of emotional distress based upon the employer's statements and conduct regarding the plaintiff's employment activities and circumstances surrounding his termination).

"When determining whether a given claim falls within the scope of an arbitration agreement, a court must 'focus on the factual allegations in the complaint rather than the legal causes of action asserted.'"  Varallo v. Elkins Park Hosp., 63 F. App'x 601, 603 (3d Cir. 2003) (citation omitted).  "If these factual allegations 'touch matters' covered by the parties' contract, then those claims must be arbitrated, whatever the legal labels attached to them."  Id. (citation omitted).  Moreover, "[a]s a matter of federal law, any doubts concerning the scope of arbitration should be resolved in favor of arbitration."  Moses H. Cone Memorial Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24-25 (1983); see also AT & T Techs., Inc. v. Comms. Workers of America,

475 U.S. 643, 650 (1986) ("[A]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.").  Accordingly, phrases such as "arising under" and "arising out of" in arbitration provisions are broadly construed to cover post-termination conduct that gives rise to employment or termination-related claims.  See Battaglia v. McKendry, 233 F.3d 720, 727 (3d Cir. 2000); see also Varallo, 63 F. App'x at 603-04 (holding district court improperly denied motion to compel arbitration as to claim arising after the date of plaintiff's termination where the facts underlying the claim were "inextricably intertwined" with events surrounding her employment and termination).

Here, Plaintiff's prospective contractual interference (Count VII) and defamation (Count X) claims "relate to or arise out of" her employment or termination with Defendants.  In Count VII of the Amended Complaint, Plaintiff claims the Company made defamatory statements to others in her industry, which tortiously interfered with her prospective contractual relationships with third parties.  (See Doc. No. 22 ¶ 177.)  Although Plaintiff claims the defamatory statements were made after her termination, it appears from the Amended Complaint that Defendants defamed her, in part, before her termination.  (See id. ¶ 102.)  Thus, this claim does not exclusively arise out of post-termination conduct by Defendants.  In any event, the alleged defamation concerned Plaintiff's termination, which plainly "relates to or arises out of" her employment and/or termination.  (See id.); see also Varallo, 63 F. App'x at 602 n.1, 604 (post-termination claims "inextricably intertwined" with events surrounding a plaintiff's employment and termination are covered by an agreement providing for arbitration of "any and all claims and disputes that are related in any way to . . . employment or the termination of . . . employment").

Accordingly, Plaintiff's claims in Counts VII and X of the Amended Complaint "relate to

or arise[] out of" her employment or termination and are covered by the language of the FTP Arbitration Provision.  Plaintiff may be compelled to arbitrate these claims despite the fact that they arose from Defendants' conduct after she was terminated.

For the reasons above, Plaintiff's claims against Defendants in the Amended Complaint are subject to the valid and enforceable arbitration provision, and the Court will compel arbitration of Plaintiff's claims.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Second Motion to Compel Arbitration and Stay Proceedings (Doc. No. 23) will be granted.  This case will be stayed pending the outcome of arbitration.  An appropriate Order follows.